**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

**FILED JUNE 14, 2005**

TOWNSHIP OF CASCO, TOWNSHIP OF
COLUMBUS, PATRICIA ISELER, and
JAMES P. HOLK,

    Plaintiffs/Counter-
    Defendants-Appellants,

v                                   No. 126120

SECRETARY OF STATE, DIRECTOR OF
THE BUREAU OF ELECTIONS, and CITY
OF RICHMOND,

and

WALTER K. WINKLE and PATRICIA A.
WINKLE,

    Intervening Defendants/
    Counter-Plaintiffs-Appellees.

---

FILLMORE TOWNSHIP, SHIRLEY GREVING,
ANDREA STAM, LARRY SYBESMA, JODY
TENBRINK, and JAMES RIETVELD,

    Plaintiffs-Appellants,

v                                   No. 126369

SECRETARY OF STATE and BUREAU OF
ELECTIONS DIRECTOR,

and

CITY OF HOLLAND,

    Intervenor-Appellee.

_____

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

These consolidated appeals present two issues. First, we must address whether a single detachment petition and a single vote on that petition, pursuant to the terms of the Home Rule City Act, MCL 117.1 *et seq.*, may encompass territory to be detached from one city and added to more than one township.[1] Second, if a single detachment petition and a single vote may encompass territory to be added to more than one township, we must determine whether a writ of mandamus compels the Secretary of State to issue a notice directing an election on the change of boundaries sought by plaintiffs in each case. Because we conclude that the Home Rule City Act does not allow a single detachment petition and a single vote on detachment for adding territory to multiple townships, mandamus is not proper in these cases. Accordingly, the decisions of the Court of Appeals are affirmed.

_____

[1] While the Home Rule City Act, MCL 117.1 *et seq.*, addresses various processes, the issue before this Court pertains solely to the process of detachment.

# I. STATEMENT OF FACTS AND PROCEEDINGS

## *Casco Twp v Secretary of State*

Plaintiffs in this case are two adjacent townships—Casco Township and Columbus Township—and residents of those townships who seek to detach territory from defendant city of Richmond. The territory sought to be detached is territory that was previously annexed to the city of Richmond.

Plaintiffs seek to present the ballot issue covering both townships in a single petition. This would result in a single vote about whether to detach territory from the city of Richmond and add the territory to Casco Township and Columbus Township. The residents of one township would be voting on the return of property to their township, as well as the return of property to a township in which they do not reside. The Secretary of State refused to approve an election on plaintiffs' petition because an election on the petition would allow residents of one township to vote on, and possibly determine, a change in the boundaries of another township in which they do not reside.

Plaintiffs filed a complaint for mandamus and declaratory relief. The circuit court dismissed plaintiffs' complaint for mandamus to compel the Secretary of State to act because it was not clear that a single

petition seeking detachment from a city and addition of the territory to two townships was permitted by the Home Rule City Act. The Court of Appeals affirmed the decision of the circuit court. *Casco Twp v Secretary of State*, 261 Mich App 386; 682 NW2d 546 (2004). We granted plaintiffs' application for leave to appeal and ordered that the case be argued and submitted with *Fillmore Twp v Secretary of State*, 471 Mich 890 (2004).

### *Fillmore Twp v Secretary of State*

Plaintiffs are Fillmore Township and electors from four townships—Fillmore Township, Holland Charter Township, Park Township, and Laketown Township-and the city of Holland who want to detach territory from the city of Holland and add the territory to the four townships. Plaintiffs filed a joint detachment petition with the Secretary of State, asking that the petition be certified and that a single election be held regarding the territory that was proposed to be detached from the city of Holland. The Secretary of State refused to certify the petition because the petition involved an effort to detach territory for addition to more than one township.

Plaintiffs filed a complaint for mandamus in the Court of Appeals, and the complaint was held in abeyance pending the decision in the *Casco Twp* case. Unpublished order,

entered May 19, 2003 (Docket No. 245640). Plaintiffs' complaint was subsequently denied by the Court of Appeals on the basis of the *Casco Twp* decision. Unpublished order, entered May 6, 2004 (Docket No. 245640). We granted plaintiffs' application for leave to appeal and ordered that the case be argued and submitted with the *Casco Twp* case. 471 Mich 890 (2004).[2]

## II. STANDARD OF REVIEW

The proper interpretation of a statutory provision is a question of law that this Court reviews de novo. *Lincoln v Gen Motors Corp*, 461 Mich 483, 489-490; 607 NW2d 73 (2000). A trial court's decision regarding a writ of mandamus is reviewed for an abuse of discretion. *In re MCI Telecom Complaint*, 460 Mich 396, 443; 596 NW2d 164 (1999).

## III. ANALYSIS

These cases involve an issue of statutory interpretation. The primary goal of statutory interpretation is to give effect to the intent of the Legislature. *Id.* at 411. The first step is to review the

---

[2] Justice Young states that the majority "fails to convey adequately the true character of the boundary disputes at issue." *Post* at 4. Yet the relevant facts are conveyed, and it is of no import if the history of these cases was contentious or of a calculated nature. The statutory analysis is the same whether the parties were friends, foes, or something in between.

language of the statute. If the statutory language is unambiguous, the Legislature is presumed to have intended the meaning expressed in the statute and judicial construction is not permissible.

The Home Rule City Act, MCL 117.1 *et seq.*, addresses four processes—incorporation, consolidation, annexation, and detachment.[3] The issue before this Court pertains only to the process of detachment. Detachment means that territory is taken from an existing city and added to an existing township.

Section 6 of the Home Rule City Act, MCL 117.6, provides that a detachment be initiated by "proceedings originating by petition therefor signed by *qualified electors* who are freeholders residing within the cities, villages, or townships to be affected thereby . . . ." (Emphasis added.) Notably, MCL 117.8 and MCL 117.11 delineate the procedure for submitting a petition for a change of boundaries. MCL 117.8(1) provides in relevant part that "the board shall, by resolution, provide that the question of making the proposed incorporation, consolidation, or change of boundaries be submitted to the *qualified electors* of the district to be affected at the

_____

[3] Recent amendments to the act do not affect the issue in this case.

6

next general election or at a special election before the next general election." (Emphasis added.) Likewise, MCL 117.11(2) provides that "the question of making the incorporation, consolidation, or change of boundaries petitioned for shall be submitted to the *electors* of the district to be affected." (Emphasis added.) Michigan election law defines a qualified elector as "any person who possesses the qualifications of an elector as prescribed in section 1 of article 2 of the state constitution and who has resided in the city or township 30 days."[4] MCL 168.10.

Because Casco Township voters do not reside in Columbus Township, they are not "qualified electors" of Columbus Township who can sign a petition and vote on the detachment of territory from the city of Richmond for addition of the territory to Columbus Township. Likewise, because Columbus Township voters do not reside in Casco

---

[4] Const 1963, art 2, § 1 provides the following:

> Every citizen of the United States who has attained the age of 21 years, who has resided in this state six months, and who meets the requirements of local residence provided by law, shall be an elector and qualified to vote in any election except as otherwise provided in this constitution. The legislature shall define residence for voting purposes.

Pursuant to US Const, Am XVI, the minimum voting age is now eighteen years.

Township, they are not "qualified electors" of Casco Township who can sign a petition and vote on the detachment of territory from the city of Richmond for addition of the territory to Casco Township. Therefore, a single petition and a single vote on multiple detachments violate the statutory language of the Home Rule City Act.

Additional support for this position is found in the statutory language used in other parts of the Home Rule City Act. MCL 117.9(1) defines the "district to be affected" as the following: "The district to be affected by every such proposed incorporation, consolidation, or *change* of boundaries shall be deemed to include the whole of each city, village, or township from which *territory* is to be taken or to which *territory* is to be annexed." (Emphasis added.)

A *change* of boundaries for the district to be affected encompasses only one city and one township because a township's voters can be qualified electors only in relation to their own township's proposed change of boundaries and are *affected* only by their own township's proposed change of boundaries. Therefore, it is only plausible that the "district to be affected" encompasses one city and one township. Accordingly, a single

8

detachment petition and a single vote may only encompass territory to be added to one township.[5]

Language in MCL 117.13, which sets forth the procedure following an election, further supports the principle that each township is considered a separate entity and there must be separate votes with respect to the territory to be detached from one city and added to each township. MCL 117.13 states, "Territory detached from any city shall thereupon become a part of the township or village from which it was originally taken . . . ." This indicates that the "district to be affected" is limited to the city in which the territory is located and the single township that seeks the return of the territory.

Further, interpreting the "district to be affected" in detachment proceedings as the city from which the territory is to be detached and the township to which the territory is to be added recognizes that the consequences of detachment may be quite different for each township that

---

[5] Other jurisdictions have held similarly. See, e.g., *City of Lake Wales v Florida Citrus Canners Coop*, 191 So 2d 453, 457 (Fla App, 1966) (A qualified elector in area 1 cannot vote for the annexation in area 2 because the area 1 voter is not within the territory affected.); *People ex rel Smith v City of San Jose*, 100 Cal App 2d 57, 60; 222 P2d 947 (1950) (An annexation election was improperly held because voters had to vote for the annexation of two parcels and could not vote separately for the annexation of each parcel.).

seeks to gain property. For example, property rights and liabilities must be adjusted between the city and the township when there is a detachment. MCL 123.1. Debts must be apportioned and land may need to be sold. MCL 123.2; MCL 123.3. The potential for dramatically different consequences of detachment are clearly indicated in the *Fillmore Twp* case. Four townships seek to detach land from the city of Holland. The Fillmore Township parcel is 1,054 acres, the Holland Charter Township parcel is 3.33 acres, the Park Township parcel is 1.27 acres, and the Laketown Township parcel is 0.77 acres. It is reasonable to conclude that the effect of detachment will be quite different when one parcel is 1,054 acres and one parcel is a mere 0.77 acres.

Moreover, allowing a single petition and a single vote on detachment from one city for the addition of territory to multiple townships does not allow voters to render a vote in support of the addition of territory to only one township. MCL 168.643a requires, in relevant part, the following:

> A question submitted to the electors of this state or the electors of a subdivision of this state shall, to the extent that it will not confuse the electorate, be worded so that a "yes" vote will be a vote in favor of the subject matter of the proposal or issue and a "no" vote

will be a vote against the subject matter of the proposal or issue.

However, a single vote on detaching territory from one city and adding the territory to multiple townships does not allow a voter who may only favor one of the multiple additions of territory to cast a "yes" vote. As stated by this Court in *Muskegon Pub Schools v Vander Laan*, 211 Mich 85, 87; 178 NW 424 (1920), "Separate subjects, separate purposes, or independent propositions should not be combined so that one may gather votes for the other." In *Vander Laan*, this Court noted that the erection of three new school buildings showed a common purpose and were part of a comprehensive plan to meet the educational needs of the city. In contrast, we find that detaching territory from one city and adding the territory to multiple townships does not indicate a common purpose because the needs and consequences of the additions to various townships may differ remarkably. Combining multiple additions of territory in a single detachment petition so that there is only a single vote indeed combines independent propositions "so that one may gather votes for the other."

When put into context, the text of the Home Rule City Act is unambiguous—a petition and a vote about detachment

11

must involve only one city and one township. A contrary reading of the statutory language belies the fact that there will *always* be two parties to a detachment—the city and the township. Justice Young's focus on the word "each" in the statute ignores that the provisions must be read in context. Interpreting the word "each" to mean that a detachment petition can encompass more than one township is contrary to the statutory language that relates to qualified electors and ignores the fact that the Home Rule City Act encompasses four distinct procedures—incorporation, consolidation, annexation, and detachment. Language in the statute that at first may appear to indicate that multiple townships may be involved in a single detachment petition and a single vote must be read in context and in consideration of the statutory language regarding qualified electors. Significantly, residents of one township are not qualified electors in a detachment proceeding when it comes to determining a change of boundaries for another township, and the statute cannot properly be interpreted in this manner.[6]

---

[6] This is consistent with principles espoused in past cases from this Court. See, e.g., *Robertson v Baxter*, 57 Mich 127, 129; 23 NW 711 (1885) ("No person not living in the township has any voice in its affairs.").

Further, Justice Young's reliance on this Court's decision in *Walsh v Secretary of State*, 355 Mich 570, 574; 95 NW2d 511 (1959), is misplaced. *Walsh* dealt with annexation, not detachment. Notably, in the multiple-township annexation at issue in *Walsh*, the votes of each territory were considered separately. In essence, a single township could "veto" the annexation from taking place, no matter how many voters approved of the annexation in other townships. In contrast, in the detachment procedure at issue in these cases, the voters in a township have no "veto" power. The wishes of an entire township could effectively be ignored because voters in other townships believe that a detachment would be in their best interests. The "package" proposal in *Walsh* is hardly analogous to the detachment proceedings at issue in these cases.

Our conclusion that a single detachment petition and a single vote on that petition may only encompass territory to be added to one township is in accord with the unambiguous statutory language. Thus, the Legislature is presumed to have intended the meaning expressed in the statute and judicial construction is not permissible.

Finally, a writ of mandamus could be properly issued in these cases only if plaintiffs proved that (1) they had a clear legal right to the performance of the specific duty

13

that they sought to be compelled, and (2) the Secretary of State had a clear legal duty to perform the act. *In re MCI, supra* at 442-443. Because the Home Rule City Act does not allow a single detachment petition and a single vote on that petition to encompass territory to be detached from one city and added to more than one township, there was no clear legal right to have the Secretary of State authorize each petition for a single vote. Therefore, there was no clear legal duty that required the Secretary of State to act, and the writs of mandamus were properly denied in both cases before this Court.

## IV. CONCLUSION

The Home Rule City Act, MCL 117.1 *et seq.*, does not allow a single petition and a single vote to encompass detachment of territory from a city for the addition of that territory to multiple townships; thus, the Secretary of State did not have a clear legal duty to act. Therefore, mandamus was not an appropriate remedy. Accordingly, the decisions of the Court of Appeals are affirmed.

> Michael F. Cavanagh
> Clifford W. Taylor
> Elizabeth A. Weaver
> Marilyn Kelly
> Maura D. Corrigan
> Stephen J. Markman

14

# STATE OF MICHIGAN

## SUPREME COURT

TOWNSHIP OF CASCO, TOWNSHIP OF COLUMBUS,
PATRICIA ISELER, and JAMES P. HOLK,

Plaintiffs/Counter-Defendants-Appellants,

V                                                          No. 126120

SECRETARY OF STATE,
DIRECTOR OF THE BUREAU OF ELECTIONS,
and CITY OF RICHMOND,

Defendants-Appellees,

and

WALTER K. WINKLE and
PATRICIA A. WINKLE,

Intervening Defendants/ Counter-Plaintiffs-Appellees.

_____

FILLMORE TOWNSHIP, SHIRLEY GREVING,
ANDREA STAM, LARRY SYBESMA,
JODY TENBRINK, and JAMES RIETVELD,

Plaintiffs-Appellants,

v                                                          No. 126369

SECRETARY OF STATE and
BUREAU OF ELECTIONS DIRECTOR,

Defendants-Appellees,

and

CITY OF HOLLAND,

Intervenor-Appellee.
_____

YOUNG, J. (*concurring in part and dissenting in part*).

We granted leave to appeal in these consolidated cases to determine whether (1) the Home Rule City Act (HRCA)[1] permits the use of a single detachment petition and election when the territory to be detached from a city is to be transferred to more than one township and, (2) if such a procedure is allowed under the HRCA, whether plaintiffs[2] are entitled to mandamus relief. I agree with the majority that plaintiffs are not entitled to writs of mandamus because I believe that any request for mandamus relief is premature at this time. I disagree, however, with the majority's conclusion that the HRCA does not permit the use of a single detachment petition and vote thereon when transferring land to multiple townships.

The Legislature was well aware of the political gamesmanship that occurs between municipalities in the context of boundary disputes. Indeed, our Constitution was changed to free the Legislature from this political

---

[1] MCL 117.1 *et seq.*

[2] Unless otherwise indicated, "plaintiffs" will be used to refer collectively to the plaintiffs in both of the cases that were consolidated. Similarly, "defendants" will be used to refer to the defendants in both cases collectively, unless otherwise noted.

quagmire.[3]  By enacting the HRCA, the Legislature established a standardized procedure to effectuate such changes in a manner that it viewed as fair and reasonable. A plain reading of *all* relevant language in the HRCA demonstrates that the use of a single detachment petition when transferring land to multiple townships is permitted. The Court of Appeals focused only on select text in the HRCA and thereby gave the statute a particular meaning that is insupportable when one considers *all* the language used by the Legislature in the HRCA.  Its exercise in selective statutory interpretation not only undermines the Legislature's intent in passing the HRCA, but also injects the judiciary—armed only with ill-defined notions of "fairness" and "justice"—as a referee in the inherently political, contentious, and tactical process of altering municipal boundaries. The majority opinion, while avoiding explicit reliance on extra-textual policy justifications, does not, in my view, give full meaning to all the relevant words in the statute.

Accordingly, I respectfully dissent from the majority's conclusion that a single detachment petition involving multiple townships is not permitted under the

---

[3] See the discussion in part III(A)(1) of this opinion.

3

HRCA.  In *Casco Twp*, I would grant the plaintiffs' request for declaratory relief and deny their claim for a writ of mandamus.  In *Fillmore Twp*, because the plaintiffs only sought a writ of mandamus, I would deny entirely their request for relief.

## I.  FACTS AND PROCEDURAL HISTORY

The majority fails to convey adequately the true character of the boundary disputes at issue.  By glossing over much of the relevant history, the majority understates the inherently political and calculated nature of the disputes.[4]

### A. *CASCO TWP V SECRETARY OF STATE*

The land at issue in this case has a long, contentious history.  In July 1996, intervening defendants, Walter and Patricia Winkle, filed a petition with the State Boundary Commission (SBC) seeking to annex to the city of Richmond approximately 157 acres of land that they and other

---

[4] Contrary to the majority's assertion, I do not contend that the factual background of these cases should alter the statutory analysis. *Ante* at 5 n 2.  Instead, I simply point out that the majority opinion, in my view, inadequately describes the true tactical and strategic character of these ongoing territorial disputes.  Moreover, the lower courts clearly believed that the ability of villages and townships to use the HRCA to their advantage was unfair.  Providing the full history of these territorial disputes helps to reveal the lower courts' policy views.

residents owned in Casco Township and Columbus Township. The Winkles hoped to develop their land for commercial use, but believed that commercial development could not occur unless their property was connected to the water and sewer lines offered by the city of Richmond.

Before the Winkles' July 1996 petition, however, Columbus Township and neighboring Lenox Township had entered into an agreement pursuant to 1984 PA 425 to transfer land from Columbus Township to Lenox Township.[5] A similar 425 agreement was reached between Casco Township and Lenox Township. These 425 agreements were designed to prevent future annexations, such as the one initiated by the Winkles in July 1996. In November 1997, the SBC determined that the 425 agreements were invalid and decided instead to approve the annexation petition filed by the Winkles.[6] After protracted litigation, the SBC's decision was eventually upheld by the Court of Appeals.[7] The Court

---

[5] 1984 PA 425 provides a detailed mechanism by which municipal entities may transfer land to one another by contract. MCL 124.21 *et seq*. Such intergovernmental transfers are commonly referred to as "425 agreements."

[6] A referendum is not required for an annexation if the territory to be affected includes one hundred or fewer residents. MCL 117.9(4).

[7] *Casco Twp v State Boundary Comm*, 243 Mich App 392; 622 NW2d 332 (2000).

5

of Appeals found that the 425 agreements between the townships of Columbus, Casco, and Lenox were "sham[s]" and "essentially an attempt to avoid annexation," and upheld the SBC's decision approving the annexation initiated by the Winkles.[8]  In July 2001, this Court denied leave to appeal.[9]

In December 2001, plaintiffs filed a single detachment petition with the Secretary of State, seeking to transfer from the city of Richmond to Casco Township and Columbus Township the same land that was involved in the prior annexation.[10]  The disputed territory consisted of

---

[8] *Id*. at 402.

[9] 465 Mich 855 (2001).

[10] Under the HRCA, a detachment petition is normally submitted to the county for certification.  MCL 117.6 However, if the territory to be affected is situated in more than one county, certification must be sought from the Secretary of State.  At the time that plaintiffs filed their petitions, § 11 of the HRCA provided:

> When the territory to be affected by any proposed incorporation, consolidation or change is situated in more than 1 county the petition hereinbefore provided shall be addressed and presented to the secretary of state . . . . [MCL 117.11.]

Because the city of Richmond is located in both St. Clair County and Macomb County, the plaintiffs filed the detachment petition with the Secretary of State pursuant to § 11.

**6**

approximately eighty-seven acres in Casco Township and seventy acres in Columbus Township.

Unsure whether the HRCA permitted the use of a single detachment petition to transfer land to multiple townships, the Secretary of State requested an official opinion from the Attorney General interpreting the HRCA. Citing a pending lawsuit in Eaton County, Michigan, involving a factually similar dispute,[11] and the Attorney General's policy of declining to issue opinions that might affect ongoing litigation, the Attorney General refused to issue a formal opinion construing the HRCA. However, in a May 2002 memorandum to the Department of State, Bureau of Elections, the Attorney General's Office provided "informal advice" regarding the use of a single detachment petition. Recognizing that there were "no cases directly on point that specifically address the issue," the memorandum informed the Department of State that it was "reasonable to

---

[11] In *City of Eaton Rapids v Eaton Co Bd of Comm'rs*, (Eaton Circuit Court, Docket No. 02-235-AZ 2002), residents of Eaton Rapids Township and Hamlin Township filed a single detachment petition to detach land from the city of Eaton Rapids. Unlike the present case, however, the territory involved in *Eaton Rapids* was situated in only one county, thus eliminating the need for involvement by the Secretary of State. In *Eaton Rapids*, the trial court *upheld* the use of a single detachment petition. The Court of Appeals subsequently denied leave to appeal in an unpublished order, entered April 16, 2002. (Docket No. 240215).

refuse to certify" the petition.[12]  The Secretary of State subsequently notified the plaintiffs that she would not certify the detachment petition.

The following month, the plaintiffs filed a complaint in the Ingham Circuit Court, seeking declaratory and mandamus relief against the defendants.  After holding a hearing, the circuit court denied the plaintiffs' request for mandamus relief, ruling that the HRCA was not "patently clear" regarding whether a single detachment petition may be used to transfer land to more than one township.  The circuit court then dismissed the plaintiffs' lawsuit without having addressed their request for declaratory relief.

The plaintiffs appealed to the Court of Appeals, claiming that the circuit court erred in denying their request for mandamus relief and in dismissing their lawsuit without deciding their request for declaratory relief.  In divided opinions, the Court of Appeals affirmed the judgment of the circuit court.[13]  The Court of Appeals majority held that the HRCA was ambiguous as to whether a

---

[12] Memorandum from the Attorney General's Office to the Department of State, Bureau of Elections (May 14, 2002).

[13] *Casco Twp v Secretary of State*, 261 Mich App 386; 682 NW2d 546 (2004).

single detachment petition was permitted. Given the ambiguity, the majority decided that it "must consider the object of the statute and apply a reasonable construction that is logical and best accomplishes the HRCA's purpose."[14]

Acknowledging that there was "no case law that directly addresse[d] the current situation,"[15] the majority concluded that it was "clearly unfair" to allow the use of a single detachment petition when transferring land to multiple townships.[16] Accordingly, the Court of Appeals denied the plaintiffs' request for mandamus relief. The Court of Appeals further held that the circuit court had "implicitly" denied the plaintiffs' request for declaratory relief and affirmed the circuit court's ruling denying declaratory relief.[17] The dissent disagreed with the majority's conclusion that the HRCA was ambiguous and noted that the plain text of the HRCA permitted the use of a single detachment petition to transfer land to multiple

---

[14] *Id.* at 392-393.

[15] *Id.* at 393.

[16] *Id.* at 394.

[17] *Id.* at 395.

townships.  We granted leave to appeal and consolidated the case with *Fillmore Twp v Secretary of State*.[18]

### B. *FILLMORE TWP V SECRETARY OF STATE*

As with the territory involved in the companion case of *Casco Twp v Secretary of State*, the disputed territory in this case also has a complex history.  In 1997, Fillmore Township and the city of Holland entered into a 425 agreement through which land in Fillmore Township was to be transferred to Holland.  Pursuant to the referendum provision in 1984 PA 425, qualified electors in Fillmore Township filed a petition calling for a referendum on the 425 agreement with the city of Holland.  The voters ultimately defeated the 425 agreement in the referendum.

Several months after the 425 agreement was defeated, in late 1998, landowners in Fillmore Township filed petitions with the SBC to annex approximately 1,100 acres to the city of Holland.  The SBC approved the annexation, thereby transferring approximately 1,100 acres from Fillmore Township to Holland.  Seeking to reverse the annexation effected by the SBC's decision, in February 2000, electors in Fillmore Township filed a petition with the Secretary of State to detach the land that was

---

[18] 471 Mich 890 (2004).

previously annexed.  In August 2000, voters in Fillmore and Holland defeated the detachment proposal by a vote of 3,917 to 2,614.

In October 2002, the plaintiffs submitted a single detachment petition to the Secretary of State,[19] again hoping to detach from the city of Holland the territory that was previously annexed from Fillmore Township.  In addition to the Fillmore Township-city of Holland detachment, however, the petition also included three smaller detachments by which land would be detached from the city of Holland and added to Laketown Township, Park Township, and Holland Charter Township.  Because the HRCA provides that "the *whole* of each city, village, or township" to be affected by the detachment is entitled to vote,[20] by adding the additional three townships to the single detachment petition, the voting base for the detachment election was greatly expanded.

The following table summarizes the acreage to be transferred by the detachment and the number of voters that

_____

[19] Certification by the Secretary of State was required under § 11 of the HRCA because the city of Holland is situated in both Ottawa County and Allegan County.

[20] MCL 117.9 (emphasis added).

**11**

would be added to the voting base by including each additional township in the single detachment petition:[21]

| Municipality | Acres To Be Received from the Detachment | Registered Voters (as of November 2002) |
| --- | --- | --- |
| City of Holland | ----- | 19,771 |
| Fillmore Township | 1,054 | 1,854 |
| Laketown Township | 0.77 | 4,166 |
| Holland Charter Township | 3.33 | 15,221 |
| Park Township | 1.27 | 11,989 |

Thus, by including the three additional townships and detaching only an extra 5.37 acres, the voting base of the district to be affected would be expanded by an additional 31,376 voters over what the voting base would be if only Fillmore Township and the city of Holland were involved.

In November 2002, the Secretary of State refused to certify the detachment petition, relying on the September 2002 decision by the circuit court disallowing the use of a single detachment petition in *Casco Twp*. In response to

---

[21] See brief of city of Holland at 9-10.

the Secretary of State's refusal to certify the petition, the plaintiffs filed an original mandamus action in the Court of Appeals seeking to have the Court order the Secretary of State to certify the petition and schedule an election. The Court of Appeals ordered that the plaintiffs' case be held in abeyance pending its resolution of *Casco Twp*. In March 2004, the Court of Appeals issued its opinion in *Casco Twp*, affirming the circuit court's decision disallowing the use of a single detachment petition. Citing its opinion in *Casco Twp*, the Court of Appeals then denied the plaintiffs mandamus relief by order in May 2004.[22] We granted leave to appeal and consolidated the case with *Casco Twp v Secretary of State*.[23]

## II. Standard of Review

Whether the HRCA permits the use of a single detachment petition to transfer land to multiple townships is a matter of statutory interpretation, which is a question of law that is reviewed by this Court de novo.[24]

---

[22] *Fillmore Twp v Secretary of State*, unpublished order of the Court of Appeals, entered May 6, 2004 (Docket No. 245640).

[23] 471 Mich 890 (2004).

[24] *Mann v St Clair Co Rd Comm*, 470 Mich 347, 350; 681 NW2d 653 (2004); *Peden v Detroit*, 470 Mich 195, 200; 680 NW2d 857 (2004); *Gladych v New Family Homes, Inc*, 468 Mich
(continued…)

The constitutionality of the HRCA's detachment procedure is also a question of law that is subject to review de novo.[25] This Court reviews a lower court's decision regarding a request for mandamus relief for an abuse of discretion.[26]

## III. ANALYSIS

### A. THE HRCA AND THE SINGLE DETACHMENT PROCEDURE

#### 1. HISTORY OF THE HRCA

The HRCA, enacted in 1909, is an intricate statute that has been amended in piecemeal fashion numerous times over the past century. Before the enactment of the HRCA, the Legislature directly enacted municipal boundary changes on a case-by-case basis through special legislation. Delegates to the 1907-1908 constitutional convention recognized the substantial burden this process imposed, as well as the confusion that resulted from hundreds of pieces

---

(…continued)

594, 597; 664 NW2d 705 (2003); *Silver Creek Drain Dist v Extrusions Div, Inc*, 468 Mich 367, 373; 663 NW2d 436 (2003).

[25] *Taxpayers of Michigan Against Casinos v Michigan*, 471 Mich 306, 317-318; 685 NW2d 221 (2004); *Wayne Co v Hathcock*, 471 Mich 445, 455; 684 NW2d 765 (2004); *DeRose v DeRose*, 469 Mich 320, 326; 666 NW2d 636 (2003).

[26] *Baraga Co v State Tax Comm*, 466 Mich 264, 268-269; 645 NW2d 13 (2002); *In re MCI Telecom Complaint*, 460 Mich 396, 443; 596 NW2d 164 (1999).

of such special legislation.  The convention's Address to the People stated:

> One of the greatest evils brought to the attention of the Convention was the abuse practiced under local and special legislation.  The number of local and special bills passed by the last legislature was *four hundred fourteen*, not including joint and concurrent resolutions.  The time devoted to the consideration of these measures and the time required in their passage through the two houses imposed a serious burden upon the state.  This section [prohibiting the enactment of special acts when a general act can be made applicable], taken in connection with the increased powers of local self-government granted to cities and villages in the revision, seeks to effectively remedy such condition. . . .  The evils of local and special legislation have grown to be almost intolerable, introducing uncertainty and confusion into the laws, and consuming the time and energy of the legislature which should be devoted to the consideration of measures of a general character.  By eliminating this mass of legislation, the work of the legislature will be greatly simplified and improved.[27]

---

[27] 2 Proceedings & Debates, Constitutional Convention 1907, pp 1422-1423 (emphasis in original).  In their Address to the People, the delegates were referring to Const 1908, art 5, § 30, which provided:

> The legislature shall pass no local or special act in any case where a general act can be made applicable, and whether a general act can be made applicable shall be a judicial question.  No local or special act, excepting acts repealing local or special acts in effect January 1, 1909 and receiving a 2/3 vote of the legislature shall take effect until approved by a majority of the electors voting thereon in the district to be affected.

Based on this overwhelming dissatisfaction with special legislation as a means to adjust municipal boundaries, delegates to the 1907-1908 constitutional convention debated whether to direct the Legislature to enact a general municipal boundary statute that would provide a framework for all future municipal boundary changes. The delegates proposed, and the people of Michigan eventually ratified, Const 1908, art 8, § 20, which provided:

> The legislature shall provide by a general law for the incorporation of cities, and by a general law for the incorporation of villages . . . .

With art 8, § 20 as a constitutional mandate, the Legislature enacted the HRCA the following year in order to establish a comprehensive, standardized procedure for initiating and approving all changes to municipal boundaries, including incorporations, annexations, detachments, and consolidations.[28]

## 2. RELEVANT PROVISIONS OF THE HRCA

As the majority correctly notes, three provisions of the HRCA are directly relevant in the present case. The

---

[28] The substance of Const 1908, art 8, § 20 was carried forward into our current Constitution as Const 1963, art 7, § 21.

detachment process is specifically authorized by § 6 of the HRCA, which provides:

> Cities may be incorporated *or territory detached therefrom* or added thereto, or consolidation made of 2 or more cities or villages into 1 city, or of a city and 1 or more villages into 1 city, or of 1 or more cities or villages together with additional territory not included within any incorporated city or village into 1 city, by proceedings originating by petition therefor signed by qualified electors who are freeholders residing within the cities, villages, or townships to be affected thereby . . . .[29]

However, because both the city of Richmond and the city of Holland are located in more than one county, rather than filing their detachment petitions with the county under § 6, plaintiffs in both cases were required to file their petitions with the Secretary of State pursuant to § 11 of the HRCA. At the time of the present lawsuits, § 11 provided:

> When the territory to be affected by any proposed incorporation, consolidation, or change is situated in more than 1 county the petition hereinbefore provided shall be addressed and presented to the secretary of state, with 1 or more affidavits attached thereto sworn to by 1 or more of the signers of said petition, showing that the statements contained in said petition are true, that each signature affixed thereto is the genuine signature of a qualified elector residing in a city, village, or township to be affected

---

[29] MCL 117.6 (emphasis added).

**17**

by the carrying out of the purposes of the petition and that not less than 25 or such signers reside in each city, village or township to be affected thereby. The secretary of state shall examine such petition and the affidavit or affidavits annexed, and if he shall find that the same conforms to the provisions of this act he shall so certify, and transmit a certified copy of said petition and the accompanying affidavit or affidavits to the clerk of *each* city, village or township to be affected by the carrying out of the purposes of such petition, together with his certificate as above provided, and a notice directing that at the next general election occurring not less than 40 days thereafter the question of making the incorporation, consolidation or change of boundaries petitioned for, shall be submitted to the electors of *the district to be affected*, and if no general election is to be held within 90 days the resolution may fix a date preceding the next general election for a special election on the question. If he shall find that said petition and the affidavit or affidavits annexed thereto do not conform to the provisions of this act he shall certify to that fact, and return said petition and affidavits to the person from whom they were received, together with such certificate. The *several* city, village and township clerks who shall receive from the secretary of state the copies and certificates above provided for shall give notice of the election to be held on the question of making the proposed incorporation, consolidation or change of boundaries as provided for in section 10 of this act.[30]

---

[30] MCL 117.11 (emphasis added). Effective January 1, 2005, § 11 was amended. None of the amendments is material to the resolution of the present cases.

Lastly, the phrase "district to be affected," as used in § 11, is defined by § 9 of the HRCA:

> The district to be affected by the proposed incorporation, consolidation, or change of boundaries is considered to include the whole of *each* city, village, or township from which territory is to be taken or to which territory is to be annexed.[31]

### 3. PRINCIPLES OF STATUTORY INTERPRETATION

When interpreting a statute, a court's duty is to give effect to the intent of the Legislature based on the actual words used in the statute.[32]  If the statutory language is clear and unambiguous, no further construction is necessary or permitted.[33]  The statute is enforced as written.[34]  It is the duty of the judiciary to interpret, not write, the law.[35]

---

[31] MCL 117.9(1) (emphasis added).

[32] *Shinholster v Annapolis Hosp*, 471 Mich 540, 548-549; 685 NW2d 275 (2004).

[33] *Lansing Mayor v Pub Service Comm*, 470 Mich 154, 157; 680 NW2d 840 (2004); *In re MCI, supra* at 411.

[34] *Stanton v Battle Creek*, 466 Mich 611, 615; 647 NW2d 508 (2002); *Huggett v Dep't of Natural Resources*, 464 Mich 711, 717; 629 NW2d 915 (2001); *Anzaldua v Band*, 457 Mich 530, 535; 578 NW2d 306 (1998); *Sanders v Delton Kellogg Schools*, 453 Mich 483, 487; 556 NW2d 467 (1996).

[35] *Koontz v Ameritech Services, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002); *State Farm Fire & Cas Co v Old Republic Ins Co*, 466 Mich 142, 146; 644 NW2d 715 (2002).

In *Lansing Mayor v Pub Service Comm*, this Court repudiated prior case law that held that a statute is ambiguous if it is susceptible to more than one meaning or if "reasonable minds can differ" regarding the statute's meaning.[36] Instead, as this Court stated in *Lansing Mayor,* a statutory provision is ambiguous only if it "'irreconcilably conflict[s]' with another provision, or when it is *equally* susceptible to more than a single meaning."[37] In ascertaining whether an ambiguity exists, therefore, a court must employ conventional rules of construction and "give effect to every word, phrase, and clause in a statute."[38]

#### 4. The Plain Text of the HRCA Permits the Use of a Single Detachment Petition to Transfer Land to Multiple Townships

At its core, the Court of Appeals opinion in *Casco Twp* represents a deliberate decision to subordinate the actual text of the HRCA in favor of the Court of Appeals' own abstract notions of fairness and justice. By choosing to give meaning to only *some* of the words in the HRCA and ignoring others, the Court of Appeals substituted its

---

[36] *Lansing Mayor, supra* at 165.

[37] *Id.* at 166 (emphasis in original; citation omitted).

[38] *Id.* at 165, 168; *Koontz, supra* at 312.

conception of "fairness" for the policy determination made by the Legislature in writing the HRCA.[39]  While this à la carte method of statutory interpretation that focuses only on certain words in a statute is extraordinarily effective at allowing a court to reach a conclusion that it views as "fair" or "just," it is an affront to the separation of powers principle.  As this Court has stated numerous times, it is the duty of the judiciary to effectuate the intent of the Legislature by giving effect to *every* "word, phrase, and clause in a statute."[40]

---

[39]  The Court of Appeals opinion is replete with references to "fairness," "injustice," "prejudice," and "absurd results."  *Casco Twp, supra*, 261 Mich App at 391, 394.  The Court of Appeals stated, "In simple terms, it is clearly unfair that citizens of one township be allowed to vote on issues that affect another township.  Indeed, the townships' combined voting strength could be used to overwhelm the city's voting strength."  *Id*. at 394.

Appellees also rely on vague notions of "fairness" and "justice" in support of their position.  See Winkle brief at 17 (permitting a multiple-township detachment would lead to "absurd results which create injustice"); Secretary of State brief at 35 ("'[p]ublic policy requires that statutes controlling the manner in which elections are conducted be construed as fair as possible'"); City of Holland brief at 20 (a multiple-township detachment is "one of the most egregious examples of . . . inherent mischief").

[40] *Lansing Mayor, supra* at 168; *Koontz, supra* at 312; *Wickens v Oakwood Healthcare Sys*, 465 Mich 53, 60; 631 NW2d 686 (2001).

A close analysis of the text of the HRCA demonstrates that the statute is not ambiguous and that a single detachment petition may be used to detach land from a city and add it to multiple townships. Although the majority focuses extensively on § 9 of the HRCA,[41] the majority notably fails to give full effect to the Legislature's use of the word "each" in § 9.

The section of the HRCA under which plaintiffs filed their petitions, § 11, provides that "the question of making the incorporation, consolidation or change of boundaries petitioned for, shall be submitted to the electors of *the district to be affected* . . . ."[42] Under § 9, the HRCA defines "the district to be affected" as "includ[ing] the whole of *each* city, village, or township from which territory is to be taken or to which territory is to be annexed."[43] By defining "the district to be affected" as including the whole of "each" city, village, or township, the Legislature contemplated that "the district to be affected" could include *multiple* townships in a detachment proceeding.

_____

[41] *Ante* at 8.

[42] MCL 117.11 (emphasis added).

[43] MCL 117.9 (emphasis added).

The word "each" is not defined in the HRCA. Pursuant to MCL 8.3a, undefined statutory terms are to be given their plain and ordinary meaning, unless, of course, the undefined word is a term of art.[44] Because "each" is not a term of art, this Court must therefore give the word its plain meaning. As this Court stated in *Horace v City of Pontiac*,[45] "[w]hen considering a nonlegal word or phrase that is not defined within a statute, resort to a layman's dictionary . . . is appropriate."[46] Moreover, it is appropriate to use a dictionary from the period contemporaneous to the statute's enactment in order to give

---

[44] MCL 8.3a provides:

All words and phrases shall be construed and understood according to the common and approved usage of the language; but technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.

See also *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 18; 651 NW2d 356 (2002); *Koontz, supra* at 312; *Donajkowski v Alpena Power Co*, 460 Mich 243, 248-249; 596 NW2d 574 (1999).

[45] 456 Mich 744; 575 NW2d 762 (1998).

[46] *Id.* at 756; see also *Halloran v Bhan*, 470 Mich 572, 578; 683 NW2d 129 (2004); *People v Jones*, 467 Mich 301, 304; 651 NW2d 906 (2002); *Stokes v Millen Roofing Co*, 466 Mich 660, 665; 649 NW2d 371 (2002); *Robinson v Detroit*, 462 Mich 439, 456 n 13; 613 NW2d 307 (2000); *Consumers Power Co v Pub Service Comm*, 460 Mich 148, 163; 596 NW2d 126 (1999).

full effect to the intent of the Legislature that enacted the statute.[47]

Although the HRCA has been amended frequently over the past century, the relevant provisions of §§ 9 and 11 have remained unchanged in the HRCA since 1909, the year the HRCA was originally enacted.  The word "each" is defined by *The New American Encyclopedic Dictionary* as "*every* one of a number considered separately, *all.*"[48]  *The Century Dictionary* defines "each" as "Being either or any unit of a numerical aggregate consisting of two *or more,* indefinitely."[49]  *Funk & Wagnalls New Standard Dictionary of the English Language* defines "each" as "Being one of two *or more* . . . *Every* one of any number or aggregation. . . ."[50]

---

[47] *Cain v Waste Management, Inc (After Remand)*, 472 Mich 236, 247; ____ NW2d ____ (2005); see also *Title Office, Inc v Van Buren Co Treasurer*, 469 Mich 516, 522; 676 NW2d 207 (2004).  Writing for the Court in *Title Office*, Justice Cavanagh noted that, in construing the word "transcript" in the 1895 Transcripts and Abstracts of Records Act (TARA), it was proper for the Court to consult a dictionary in use "[a]*t the time of enactment* of [the] TARA." *Id*. (emphasis added).

[48] *The New American Encyclopedic Dictionary*, p 1575 (1907) (emphasis added).

[49] *The Century Dictionary:  An Encyclopedic Lexicon of the English Language*, p 1813 (1906) (emphasis added).

[50] *Funk & Wagnalls New Standard Dictionary of the English Language*, p 779 (1913) (emphasis added).

It is clear, therefore, that the word "each," as used in 1909, means "all" and "every," and plainly encompasses *multiple* entities. Indeed, by using "each" in § 9, the Legislature effectively said, as a definitional matter, that "the district to be affected" is to be comprised of "all" or "every" city, village, or township affected by the boundary change. The "district" is not limited to a predetermined number, but rather includes *every* municipal entity from which territory is to be taken or to which territory is to be added. Thus, while "the district to be affected" can certainly contain just two municipal entities, it can also include *more than* two entities.[51]

Defendants argue that the Legislature's use of the word "each" is not determinative because, by using "each," the Legislature was simply referring to the two municipal entities that necessarily must be involved in any detachment proceeding: the city that will lose the land

---

[51] The Legislature's use of the word "each" was not limited solely to § 9 and the definition of "the district to be affected." For example, the same provision under which plaintiffs filed their petitions, § 11, directly states that the Secretary of State shall transmit a certified copy of the petition to "*each* city, village or township to be affected by the carrying out of the purposes of such petition . . . ." MCL 117.11 (emphasis added).

and the township that will gain the land.[52]  Defendants'

argument is unpersuasive.  Had the Legislature intended

"each" to refer only to the two sides involved in a typical

detachment proceeding—the donor city and the recipient

township—and not to multiple recipient townships, the

Legislature would have used the word "both," not "each."[53]

The Legislature, however, did not limit "the district to be

affected" to only two municipal entities by using the word

"both."  Instead, it deliberately used the distributive

adjective "each," thereby referring to *every* municipality

affected.  It is only by assuming that "each" refers

exclusively to the donor and recipient municipalities in a

*conventional* detachment proceeding that the majority

position may be sustained.  There is no textual basis for

---

[52]  The majority makes a similar, though more general, argument.  It notes that a reading of the HRCA "contrary" to its own "belies the fact that there will *always* be two parties to a detachment—the city and the township."  *Ante* at 12 (emphasis in original).  Conspicuously, the majority neglects to give meaning to the Legislature's use of the word "each."

[53]  *The New American Encyclopedic Dictionary*, p 580 (1907) defines "both" as "*two* taken together" and *The Century Dictionary:  An Encyclopedic Lexicon of the English Language*, p 636 (1906) defines "both" as "The one and the other; *the two*; the pair or the couple, in reference to *two* persons or things . . . ."

making this assumption or otherwise limiting the customary meaning of "each."[54]

---

[54] Further examination of the text of § 11 demonstrates that a single detachment petition may be used to transfer land to multiple townships. For example, § 11 states, "The *several* city, village and township clerks who shall receive from the secretary of state the copies and certificates above provided shall give notice of the election to be held . . . ." The word "several" is defined by *The New American Encyclopedic Dictionary* (1907) as "Consisting of a number; *more than two*." The use of "several," therefore, also indicates that the Legislature envisioned a situation under which a single detachment petition could be used to transfer land to *multiple* townships. While it is true that "several" can also mean "separate" or "individual"—e.g., "they go their *several* ways"—such a meaning exists only in the context of a *plurality*. "Several" only indicates "individual" or "separate" if there is a larger collective whole to begin with.

At oral argument, defense counsel conceded that the word "several," as used in the HRCA, means "more than a couple."

> *Justice Young*: I'm asking you to look at section 11 that refers near the end: "The several city, village and township clerks who shall receive from the Secretary of State copies of the certificates." I'm looking at the term "several" there. Does that not indicate at least the potential for multiple—
>
> *Counsel*: Well again we go to kind of the dictionary look at the definition and "several" can mean one individual.
>
> *Justice Young*: Really?
>
> *Counsel*: I'm sorry, you're talking about a city, village or –
>
> *Justice Young*: Doesn't "several" mean more than a couple?

(continued…)

This construction of the HRCA is bolstered by the fact that, throughout § 11, the words "petition" and "election" are used in the singular even though the words "each" and "several" are used in the same sentences when modifying "city, village or township."  For example, § 11 states that the Secretary of State must transmit "a certified copy of said *petition* . . . to the clerk of *each* city, village  or township to be affected by the carrying out of the purposes of such *petition* . . . ."[55]  Section 11 further provides that "[t]he *several* city, village and township clerks . . . shall give notice of *the election* to be held . . . ."[56] While it is true that MCL 8.3b states that, in construing statutes, "[e]very word importing the singular number only

---

(…continued)

> *Counsel*:  Yes.

[55] MCL 117.11 (emphasis added).  The word "petition" is used in the singular three other times in § 11:

> The secretary of state shall examine such *petition* and the affidavit or affidavits annexed . . . .  If he shall find that said *petition* and the affidavit or affidavits annexed thereto do not conform to the provisions of this act he shall certify to that fact, and return said *petition* and affidavits to the person from whom they were received . . . .  [*Id*. (emphasis added).]

[56] *Id*. (emphasis added).

**28**

may extend to and embrace the plural number," it is important to remember that MCL 8.3b is *permissive*, not mandatory. MCL 8.3b states only that the singular "may" extend to the plural.

This Court addressed MCL 8.3b in *Robinson,* in which we construed the phrase "*the* proximate cause" within the context of the governmental immunity statute.[57] As we noted in *Robinson*, MCL 8.3b "only states that a word importing the singular number 'may extend' to the plural. The statute does not say that such an automatic understanding is required."[58] We went on to hold that MCL 8.3 "provides that the rule stated in § 3b shall be observed 'unless such

---

[57] MCL 691.1407(2) provides:

> Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency . . . is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service . . . if all of the following are met:
>
> *       *       *
>
> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is *the proximate cause* of the injury or damage. [Emphasis added.]

[58] *Robinson, supra* at 461 n 18.

**29**

construction would be inconsistent with the manifest intent of the Legislature.'"[59] This Court concluded that because the Legislature chose to use the definite article "the" within the phrase "the proximate cause," it "clearly evince[d] an intent to focus on *one* cause."[60]

The same is true in the present case. In § 11, the Legislature consistently referred to "petition" in the singular and used the phrase "*the* election." There is no principled basis by which to say that "the" means "one" in *Robinson*, but "the" does not mean "one" when referring to "*the* election" mandated by § 11.

Taken together, all of these textual clues demonstrate that the HRCA permits the use of a *single* detachment petition and election when transferring land to more than one township. Unlike the majority, which focuses only on select words in the HRCA, I believe that this Court is obligated to give effect to *every* word the Legislature used in writing the HRCA. I would hold, therefore, that the Court of Appeals erred in finding that the HRCA is ambiguous. No provision of the HRCA conflicts, irreconcilably or otherwise, with any other provision of

---

[59] *Id.*

[60] *Id.* at 458-459 (emphasis added).

the HRCA.  Nor is the HRCA *equally* susceptible to more than a single meaning.  A plain reading of §§ 9 and 11 demonstrates that the procedure used by plaintiffs in the present cases is permissible under the HRCA.

The majority casually dismisses this Court's decision in *Walsh v Secretary of State*,[61] which explicitly recognized and permitted a single petition for a multiple-municipality annexation under the HRCA.  In *Walsh*, we examined §§ 9 and 11 of the HRCA.  The case involved an annexation by the city of Lansing in which it sought to acquire four parcels of land from Lansing Township and one parcel situated in both Lansing Township and Delta Township.  A *single* petition was filed with the Secretary of State for this multiple-township annexation.  Although voters in the city of Lansing and Lansing Township approved the annexation, voters in Delta Township did not.

The plaintiffs in *Walsh* argued that the annexation attempt was divisible and that we should approve the annexation of the parcels in Lansing Township, given that the Lansing Township voters approved the annexation.  This Court disagreed.  We held that the annexation was a "package proposition" and that, under the vote tabulation

_____

[61] 355 Mich 570; 95 NW2d 511 (1959).

**31**

provisions of § 9 in effect at the time, if any one of the "voting units" voted against the proposal, the whole proposal failed.[62]

While it is true that *Walsh* involved an analogous annexation rather than a detachment, and that the primary focus in *Walsh* was on the vote tabulation provisions of the HRCA, not the definition of "district to be affected," this Court accepted the use of a single "package" petition even though the land that was to be annexed consisted of five distinct parcels in two separate townships. Accordingly, the single petition procedure used by plaintiffs in the present cases is not "novel" as defendants contend. Indeed, as *Walsh* demonstrates, this Court's own case law has countenanced the use of such a procedure under the HRCA in the closely analogous annexation context.

### 5. THE MAJORITY'S RELIANCE ON THE HRCA'S "QUALIFIED ELECTOR" REQUIREMENT AND THE ELECTION CODE IS MISPLACED

The majority bases its holding primarily on the "qualified elector" requirement in §§ 6 and 11 of the HRCA.[63] Section 6 provides that detachment proceedings must be initiated by

---

[62] *Id.* at 574.

[63] *Ante* at 6-7.

32

> proceedings originating by petition therefor signed by *qualified electors* who are freeholders residing within the cities, villages, or townships to be affected thereby . . . .[64]

Section 11 requires affidavits showing that

> each signature affixed [to the petition] is the genuine signature of a *qualified elector* residing in *a* city, village or township *to be affected* by the carrying out of the purposes of the petition and that not less than 25 of such signers reside in *each* city, village or township to be affected thereby.[65]

The majority concludes that any multiple-township petition always violates the "qualified elector" rule because a signatory who is a qualified elector of township A is obviously not a qualified elector of township B, in that the signatory is not a resident of the territory "to be affected" in township B.

The majority's analysis is flawed. The "qualified elector" provision of § 11 merely requires that each signatory be a qualified elector of "a" city, village, or township affected by the detachment and that there be at least twenty-five signatures from "each" municipality affected. It is uncontested in the present cases that at least twenty-five qualified electors from *each* city and

---

[64] MCL 117.6 (emphasis added).

[65] MCL 117.11 (emphasis added).

township involved signed the petitions.[66]  What the majority's argument is actually advancing is the unstated predicate point that the "district to be affected" cannot encompass more than one township.  However, because the Legislature has permitted the "district to be affected" to include multiple townships, as the textual analysis above and the *Walsh* case demonstrate, then every township that is bundled into the single petition is necessarily "affected" within the meaning of the "qualified voter" provision in § 11.[67]

The majority's reliance on § 643a in the Michigan Election Law, MCL 168.643a, is also misplaced.[68]  While it is true that § 643a requires electoral questions to be submitted to voters in a "yes or no" format, there is no

---

[66] Similarly, § 6 simply requires that the signatories be qualified electors of "the cit*ies*, villag*es*, or township*s* to be affected thereby."  The Legislature conspicuously referred to the municipalities in the plural.

[67] The majority also relies on MCL 117.13, which states, "Territory detached from any city shall thereupon become a part of the township or village from which it was originally taken . . . ."  *Ante* at 9.  Contrary to the majority's assertion, this language does not prohibit the use of a single detachment petition involving multiple townships.  It merely delineates which municipality will control the territory after the detachment is effectuated.  The language of § 13 applies with equal force if multiple townships are involved in a single detachment proceeding.

[68] *Ante* at 10-11.

reason why a single detachment petition and referendum involving multiple townships violates this requirement. Indeed, that was the exact situation in *Walsh*, which held that the multiple-township annexation was a "package" proposition and not divisible.

In fact, the precise case that the majority cites for its § 643a rationale–*Muskegon Pub Schools v Vander Laan*[69]– involved a multiple-issue proposal that was put to the voters in a single "yes or no" format and *upheld* by this Court. In *Vander Laan*, a school district bundled bonding proposals for three separate school buildings into a single question to be submitted to the voters. This Court *unanimously* approved the use of the multiple-issue proposal.[70] Although the *Vander Laan* Court acknowledged the rule established in other jurisdictions that "[s]eparate subjects, separate purposes, or independent propositions should not be combined [in a single electoral question] so that one may gather votes for the other," it noted that there was no statutory basis for the rule in Michigan.[71] Nevertheless, the *Vander Laan* Court still imposed a

---

[69] 211 Mich 85; 178 NW 424 (1920).

[70] *Id*. at 88-89.

[71] *Id*. at 87.

"separate subjects" rule and ultimately *upheld* the multiple-issue proposal because it "was characterized by one common purpose . . . ."[72]

I question the majority's reliance on *Vander Laan* when the *Vander Laan* Court itself noted that there was no statutory basis for the "separate subjects" electoral rule that it recognized. Rather than rely on a judicially created rule that was premised on policy concerns in an unrelated area, I prefer to base my analysis of the multiple-township detachment procedure on the actual text of the HRCA. However, to the extent that *Vander Laan*—a case that did not even involve the HRCA—is controlling in the present cases, I believe that the multiple-township detachments are in accord with its holding because the detachments are united by a "common purpose."

### 6. DEFENDANTS' REMAINING ARGUMENTS

Defendants argue that to construe the HRCA so as to permit a single, multiple-township petition would lead to "absurd results." However, in *People v McIntire*,[73] this Court rejected the absurd results "rule" of construction, noting that its invocation is usually "'an invitation to

---

[72] *Id*. at 88.

[73] 461 Mich 147; 599 NW2d 102 (1999).

judicial lawmaking.'"[74]  It is not the role of this Court to rewrite the law so that its resulting policy is more "logical," or perhaps palatable, to a particular party or the Court.  It is our constitutional role to give effect to the intent of the Legislature by enforcing the statute *as written*.[75]  What defendants in these cases (or any other case) may view as "absurd" reflects an actual policy choice adopted by a majority of the Legislature and approved by the Governor. If defendants prefer an alternative policy choice, the proper forum is the Legislature, not this Court.  After all, the Legislature has shown little reluctance in amending the HRCA over the past century.

The defendants in *Fillmore Twp* also argue that if the detachment of 1.27 acres from the city of Holland for addition to Park Township is permitted, it would violate the "contiguity" rule articulated by this Court in *Genesee Twp v Genesee Co*,[76] a case involving an annexation of land

---

[74] *McIntire, supra* at 156 n 2, quoting Scalia, *A Matter of Interpretation:  Federal Courts and the Law* (New Jersey: Princeton University Press, 1997), p 21.

[75] See *People v Javens*, 469 Mich 1032, 1033 (2004) (Young, J., concurring).  The exception, of course, is if the statute is unconstitutional.

[76] 369 Mich 592; 120 NW2d 759 (1963).

from Genesee Township to the city of Mt. Morris.  In *Genesee Twp*, this Court stated:

> "So, as to territorial extent, the idea of a city is one of unity, not of plurality; of compactness or contiguity, not separation or segregation. Contiguity is generally required even in the absence of statutory requirement to that effect, and where the annexation is left in the discretion of a judicial tribunal, contiguity will be required as a matter of law."[77]

Recognizing that the requirement of contiguity was not "covered by any specific provision of the [HRCA]," the Court in *Genesee* Twp instead based its holding on non-textual policy grounds:  "the purpose sought to be served [by the HRCA] and the practical aspects of annexation . . . ."[78]

However, this Court revisited the contiguity rule eight years later in *Owosso Twp v City of Owosso*.[79]  We specifically stated in *Owosso* that "the judicial requirement of 'contiguity'" articulated in *Genesee* Twp had been "superseded" when the Legislature amended § 9 of the

---

[77] *Id.* at 603, quoting 37 Am Jur, Municipal Corporations, § 27, pp 644-645.

[78] *Id.* at 602.

[79] 385 Mich 587; 189 NW2d 421 (1971).

HRCA in 1970.[80]  We found that the "substantive standards" established by the Legislature when it amended § 9 clearly displaced the court-made contiguity rule.[81]  Defendants in the present cases would apparently have this Court ignore the legislative intent of § 9 and resuscitate the judicially created contiguity rule in the HRCA context.  I would decline the invitation.

### 7.  CONSTITUTIONALITY OF THE HRCA

Because I believe that the HRCA permits the use of a single detachment petition involving multiple townships, it is necessary to determine whether the HRCA's authorization of such a procedure is constitutional.  Defendants, particularly those in *Fillmore Twp*, contend that bundling numerous townships into a single petition and referendum unconstitutionally dilutes the vote of city residents.[82]

---

[80] *Id*. at 588-590.

[81] *Id*. at 590.  The Court of Appeals elaborated on this point in *Bloomfield Charter Twp v Oakland Co Clerk*, 253 Mich App 1, 34; 654 NW2d 610 (2002).

[82] It is worth noting that these consolidated cases do not involve any allegations of discrimination, or the impairment of voting rights, on the basis of race or any other suspect classification.  See, e.g., Gerken, *Understanding the right to an undiluted vote*, 114 Harv L R 1663 (2001).  The sole issue of contention here is one of pure numerical vote dilution.  Defendants claim that *too many* township voters would be included in the voting base
(continued…)

**39**

Defendants argue that such vote dilution is prohibited under the Equal Protection Clause of US Const, Am XIV.[83]

_____

(…continued)

if these referenda are allowed to proceed, to the extent that city voters would no longer have a *meaningful* vote.

[83] While defendants allege violations of both the federal and state equal protection clauses, they base their vote dilution argument almost entirely on federal case law. They cite no Michigan cases analyzing vote dilution under Const 1963, art 1, § 2. Instead, defendants simply state in their brief that "Michigan courts interpret the state equal protection clause similarly to the Fourteenth Amendment." City of Holland brief at 39.

It is important to note that the text of our state Equal Protection Clause is not entirely the same as its federal counterpart:

US Const, Am XIV provides in pertinent part:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; *nor deny to any person within its jurisdiction the equal protection of the laws*. [Emphasis added.]

Const 1963, art 1, § 2 provides:

No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation.

See also *Lind v Battle Creek*, 470 Mich 230, 234-235; 681 NW2d 334 (2004) (Young, J., concurring).

(continued…)

Given the facts surrounding defendants' vote dilution claim, it is easy to understand their argument. As discussed in part I(B) of this opinion, it is obvious, for example, that the plaintiffs in *Fillmore Twp* deliberately included the three additional townships—Laketown, Holland Charter, and Park—as a means to equalize the voting disparity between the city of Holland and Fillmore

---

(…continued)

Therefore, it is insufficient for defendants to rely solely on federal case law regarding vote dilution, or Michigan cases interpreting the *federal* Equal Protection Clause, and then boldly announce that Const 1963, art 1, § 2 provides the same protections against vote dilution as US Const, Am XIV.

Because defendants have failed to address vote dilution directly under Const 1963, art 1, § 2, I decline to examine the issue. As this Court stated in *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959):

> It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow.

Moreover, the constitutional provision upon which defendants base their argument, Const 1963, art 1, § 2, was not relied on by the Court of Appeals. It was Const 1963, art 1, § 1 that the Court of Appeals referenced in its opinion. *Casco Twp*, *supra*, 261 Mich App at 394 n 27.

Accordingly, I analyze defendants' vote dilution argument solely under US Const, Am XIV—the issue that was fully briefed by the parties.

**41**

Township.  In the initial August 2000 detachment vote that included only the city of Holland and Fillmore Township, voters rejected the detachment by a vote of 3,917 to 2,614 (approximately sixty percent against, forty percent in favor).  Recognizing that the number of voters in the city of Holland exceeded the number of voters in Fillmore Township by 19,771 to 1,854, almost a 10.7 to 1 margin, the plaintiffs bundled the three additional townships into the petition by seeking to detach an additional 5.37 acres (0.77 acres for Laketown Township, 3.33 acres for Holland Charter Township, and 1.27 acres for Park Township).  By doing so, the plaintiffs were able to add an additional 31,376 township voters to the voting base of the "district to be affected" and thereby exceed the voting base of the city of Holland.  In order to evaluate defendants' claims of unconstitutional vote dilution—an issue on which Michigan courts have been relatively silent—it is necessary to explore briefly the history of federal vote dilution law under the Equal Protection Clause of the Fourteenth Amendment.[84]

---

[84] As an initial matter, it is important to note that the state action requirement under Fourteenth Amendment jurisprudence is satisfied here.  Although the detachment petitions in both cases were circulated and signed by private citizens, the involvement of the Secretary of State

(continued…)

The idea of "vote dilution"[85] as a cognizable constitutional harm originated in the context of congressional and state legislative apportionment cases. Initially, courts refused to get involved in claims regarding vote dilution. The issue was viewed as best left for the political process and considered nonjusticiable. The leading case establishing this view was the United States Supreme Court's decision in *Colegrove v Green*,[86] in

---

(…continued)
in certifying the petitions and ordering local authorities to hold elections is sufficient to constitute state action. See, e.g. *Ellison v Garbarino*, 48 F3d 192, 195 (CA 6, 1995) ("running elections" is a "typical example[ ]" of state action).

[85] Professor Melvyn R. Durchslag has noted:

Voter dilution cases fall into two broad categories. First, there are those in which dilution occurs because (1) some persons are given votes weighted more heavily than others similarly situated merely on the basis of residence, (2) votes are weighted according to a factor which the state determines is reflective of "interest," or (3) persons are excluded altogether from voting because the state deems them to be "uninterested." Second, there are those in which dilution occurs because equal franchise is *granted* to persons allegedly without interest, or with significantly less interest than other voters. [Durchslag, Salyer, Ball, and Holt: *Reappraising the right to vote in terms of political "interest" and vote dilution*, 33 Case W Res L R 1, 38-39 (1982) (emphasis in original).]

[86] 328 US 549; 66 S Ct 1198; 90 L Ed 1432 (1946).

which voters challenged the Illinois congressional districting scheme because several of the districts were comprised of larger populations than others. Stating that the harm was one to "Illinois as a polity" and not a private wrong, the Court refused to intervene.[87] In rejecting the notion that the Court should get involved in what it viewed as a political question, Justice Frankfurter wrote that "[c]ourts ought not to enter this political thicket."[88] He went on to note:

> The remedy for unfairness in districting is to secure State legislatures that will apportion properly, or to invoke the ample powers of Congress. . . . The Constitution has left the performance of many duties in our governmental scheme to depend on the fidelity of the executive and legislative action and, ultimately, on the vigilance of the people in exercising their political rights.[89]

However, approximately fifteen years after *Colegrove*, the Supreme Court reversed course in the landmark case of *Baker v Carr*.[90] In *Baker*, the Court was presented with a constitutional challenge to the apportionment of the

---

[87] *Id*. at 552.

[88] *Id*. at 556.

[89] *Id*.

[90] 369 US 186; 82 S Ct 691; 7 L Ed 2d 663 (1962).

Tennessee General Assembly. Despite significant demographic shifts that occurred within Tennessee, the state had not reapportioned its legislative districts in over sixty years. Voters filed suit and claimed that, in light of the drastic change in population, the state's failure to reapportion the General Assembly amounted to a violation of their equal protection rights under the Fourteenth Amendment.

The Court rejected the "political question" rationale used in *Colegrove* and held that the issue presented by the voters was justiciable. Justice Brennan, writing for the Court, stated that "the mere fact that the suit seeks protection of a political right does not mean it presents a political question."[91] The Court went on to hold that the Equal Protection Clause provided a proper vehicle by which to challenge the Tennessee apportionment system.[92] In its

---

[91] *Id*. at 209.

[92] *Id*. at 237. Commentators have questioned the Supreme Court's reliance on the Equal Protection Clause in *Baker*, suggesting, instead, that the Republican Form of Government Clause, US Const, art IV, § 4, would have been more appropriate. As Judge Michael W. McConnell has written:

> A districting scheme so malapportioned that a minority faction is in complete control, without regard to democratic sentiment, violates the basic norms of republican government. It

(continued…)

sweeping holding, the Court did not provide any guidelines

regarding how the Equal Protection Clause should be applied

to voting rights cases nor establish any standards by which

---

would thus appear to raise a constitutional question under Article IV, Section 4, which states that "the United States shall guarantee to every State in this Union a Republican Form of Government." Constitutional standards under the Republican Form of Government Clause are ill-developed, but surely a government is not "republican" if a minority faction maintains control, and the majority has no means of overturning it. [McConnell, *The redistricting cases: Original mistakes and current consequences*, 24 Harv J L & Pub Policy 103, 105-106 (2000).]

Professor Pamela S. Karlan has noted:

[T]he doctrinal move to one person, one vote was in no sense compelled, either by precedent or by the absence of any alternative avenues to judicial oversight. The decision to rely on the Equal Protection Clause, rather than on the Guaranty Clause, has always puzzled me. Justice William Brennan's explanation—that there was precedent suggesting the general nonjusticiability of the Guaranty Clause—would make more sense if not for the fact that there was also absolutely square precedent refusing to entertain malapportionment claims under the Fourteenth Amendment [citing *Colegrove*]. If the Court had to overrule some precedent to review apportionment and the refusal to reapportion, then why was overruling Fourteenth Amendment precedent—and developing a unique set of equal protection principles that apply nowhere else in constitutional law—the superior alternative? [Karlan, *Politics by other means*, 85 Va L R 1697, 1717-1718 (1999).]

to implement the new role for the judiciary in such cases. Instead, the Court simply stated, "Nor need the [voters challenging the apportionment], in order to succeed in this action, ask the Court to enter upon policy determinations for which judicially manageable standards are lacking. Judicial standards under the Equal Protection Clause are well developed and familiar . . . ."[93]

With *Baker* creating the opening, courts soon began to wade head-high into the thicket of vote dilution claims.

---

[93] *Baker, supra* at 226. In dissent, Justice Frankfurter sharply criticized the Court for casting aside the "political question" rationale of *Colegrove*. He challenged the majority's conclusion that courts were equipped to handle such voting rights cases. Justice Frankfurter stated:

> The Framers carefully and with deliberate forethought refused . . . to enthrone the judiciary. In this situation, as in others of like nature, appeal for relief does not belong here. Appeal must be to an informed, civically militant electorate. . . .
>
> *          *          *
>
> Unless judges, the judges of this Court, are to make their private views of political wisdom the measure of the Constitution—views which in all honesty cannot but give the appearance, if not reflect the reality, of involvement with the business of partisan politics so inescapably a part of apportionment controversies—the Fourteenth Amendment, "itself a historical product," provides no guide for judicial oversight of the representation problem. [*Id*. at 270, 301-302 (citation omitted).]

Two years after *Baker*, the Supreme Court decided *Wesberry v Sanders*[94] and *Reynolds v Sims*,[95] which established, as a fundamental tenet of equal protection jurisprudence, the "one-person, one-vote" standard for congressional districts and state legislative districts, respectively. In *Reynolds*, the Court stated that "the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State."[96]

The Court later made the one-person, one-vote standard applicable to local governments in *Avery v Midland Co.*[97] In *Avery*, the Court invalidated the apportionment system for the Commissioners Court of Midland County, Texas, because it consisted of "single-member districts of substantially unequal population," which favored rural voters over city voters.[98] The Court reasoned that, because the Commissioners Court exercised "general governmental

---

[94] 376 US 1; 84 S Ct 526; 11 L Ed 2d 481 (1964).

[95] 377 US 533; 84 S Ct 1362; 12 L Ed 2d 506 (1964).

[96] *Id*. at 579.

[97] 390 US 474; 88 S Ct 1114; 20 L Ed 2d 45 (1968).

[98] *Id*. at 475-476.

powers"[99] and its actions had a "broad range of impacts on all the citizens of the county,"[100] the one-person, one vote standard should apply.[101]

As *Wesberry*, *Reynolds*, *Avery*, and their progeny demonstrate, the one-person, one-vote standard has become a well-established principle in equal protection jurisprudence. At the same time, two notable exceptions to

[99] *Id*. at 476, 484-485. Under Texas law, the Commissioners Court possessed wide-ranging powers, including the authority to appoint officials and fill vacancies in county offices, contract on behalf of the county, build roads, administer welfare programs, run elections, issue bonds, set tax rates, and adopt the county budget. *Id*. at 476.

[100] *Id*. at 483.

[101] *Id*. at 484-485. After *Avery*, the Supreme Court struck down numerous other local voting arrangements. See *Kramer v Union Free School Dist No 15*, 395 US 621; 89 S Ct 1886; 23 L Ed 2d 583 (1969) (invalidating a New York law that restricted voting in school district elections to owners and lessees of taxable property within the school district and to parents of children attending the schools); *Cipriano v City of Houma*, 395 US 701; 89 S Ct 1897; 23 L Ed 2d 647 (1969) (invalidating a state law that limited the vote in a municipal bond election to taxpayers); *City of Phoenix v Kolodziejski*, 399 US 204; 90 S Ct 1990; 26 L Ed 2d 523 (1970) (same); *Hadley v Junior College Dist of Metro Kansas City*, 397 US 50; 90 S Ct 791; 25 L Ed 2d 45 (1970) (applying the one-person, one-vote standard to a junior college electoral district); *Bd of Estimate of New York City v Morris*, 489 US 688; 109 S Ct 1433; 103 L Ed 2d 717 (1989) (invalidating the city of New York's Board of Estimate because each of the five New York City borough presidents possessed an equal vote on the Board, even though the boroughs had "widely disparate populations").

the one-person, one-vote rule are just as firmly entrenched in equal protection analysis.  The first involves so-called "special purpose districts."  Under this exception, electoral districts that serve a specialized purpose, such as a water storage district, are exempt from strict scrutiny and the rigid one-person, one-vote standard because they perform functions that "'so disproportionately affect different groups that a popular election'" is not warranted.[102]

The second, and more relevant, exception to the one-person, one-vote standard involves changes to municipal boundaries.  Indeed, the Supreme Court recognized the unique nature of boundary changes as early as 1907 in the seminal case of *Hunter v Pittsburgh*,[103] nearly sixty years before the one-person, one-vote standard was established.  In *Hunter*, the city of Allegheny was annexed to the city of

---

[102] *Salyer Land Co v Tulare Lake Basin Water Storage Dist*, 410 US 719, 728-729; 93 S Ct 1224; 35 L Ed 2d 659 (1973), quoting *Hadley, supra* at 56.  Nearly a decade after *Salyer*, in *Ball v James*, 451 US 355; 101 S Ct 1811; 68 L Ed 2d 150 (1981), the Supreme Court extended the *Salyer* "special purpose district" exception to a water district that served many urban customers (including the city of Phoenix), unlike the district in *Salyer*, which served mostly agricultural users.  See also Briffault, *Who rules at home?:  One person/One vote and local governments,* 60 U Chi L R 339, 359-360 (1993).

[103] 207 US 161; 28 S Ct 40; 52 L Ed 151 (1907).

Pittsburgh.  Under state law, the votes in both cities on the annexation were aggregated.  Voters in Allegheny, who were greatly outnumbered by voters in Pittsburgh, claimed that their votes were unconstitutionally diluted.  The Supreme Court rejected the dilution claim and held that states have complete control over municipalities:

> The State, therefore, at its pleasure may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the State is supreme, and its legislative body, conforming its action to the state constitution, may do as it will, unrestrained by any provision of the Constitution of the United States. Although the inhabitants and property owners may by such changes suffer inconvenience, and their property may be lessened in value by the burden of increased taxation, or for any other reason, they have no right by contract or otherwise in the unaltered or continued existence of the corporation or its powers, and there is nothing in the Federal Constitution which protects them from these injurious consequences. The power is in the State and those who legislate for the State are alone responsible for any unjust or oppressive exercise of it.[104]

---

[104] *Id.* at 178-179.

This Court fully embraced the rationale of *Hunter* in *Midland Twp v State Boundary Comm.*[105] The case involved an equal protection challenge to provisions of the HRCA that provided for a referendum if the area to be affected included more than one hundred persons, but excluded the possibility of a referendum when one hundred or fewer persons were affected. In rejecting the equal protection argument, Justice Levin, writing for the Court, directly relied on *Hunter* and held, "No city, village, township *or person* has any vested right or legally protected interest in the boundaries of such governmental units."[106]

Although *Hunter* preceded the establishment of the one-person, one-vote standard by half a century, its holding has endured throughout modern equal protection jurisprudence.[107] Indeed, municipal boundary changes have

---

[105] 401 Mich 641, 664-666; 259 NW2d 326 (1977).

[106] *Id*. at 664 (emphasis added). See also *Rudolph Steiner School of Ann Arbor v Ann Arbor Charter Twp*, 237 Mich App 721, 736; 605 NW2d 18 (1999) ("'No . . . person has any vested right or legally protected interest in the boundaries of . . . governmental units.' Changing the boundaries of political subdivisions is a legislative question. The Legislature is free to change city, village, and township boundaries at will." [citations omitted].).

[107] *Holt Civic Club v City of Tuscaloosa*, 439 US 60, 71; 99 S Ct 383; 58 L Ed 2d 292 (1978) ("[W]e think that [*Hunter*] continues to have substantial constitutional significance in emphasizing the extraordinarily wide
(continued…)

traditionally been exempted from the one-person, one-vote rule and strict scrutiny review.[108] This issue was addressed in detail by the Supreme Court in the leading case of *Town of Lockport v Citizens for Community Action at the Local Level, Inc*,[109] which involved a claim by city voters that their votes were unconstitutionally diluted by rural voters.

---

(…continued)
latitude that States have in creating various types of political subdivisions and conferring authority upon them.").

[108] Note, *Interest exceptions to one-resident, one-vote: Better results from the Voting Rights Act?*, 74 Tex L R 1153, 1168-1169 (1996) ("Even after political questions like that in *Hunter* were found to be justiciable, the Court has generally adhered to the rule of *Hunter* to decide equal protection challenges to jurisdictional boundary changes. Defining residency is a matter of state discretion subject only to rational basis review."). See also Briffault, *supra* at 342-343 ("Boundary change[s] . . . have been defined as largely outside the scope of constitutional protection. This has limited the impact of one person/one vote on many traditional state-authorized local arrangements, preserving considerable flexibility for state regulation of governance at the local level.").

In 1992, the California Supreme Court held that rational basis review applies to limitations on the right to vote when a municipal boundary change is at issue. *Sacramento Co Bd of Supervisors v Sacramento Co Local Agency Formation Comm*, 3 Cal 4th 903; 838 P2d 1198; 13 Cal Rptr 2d 245 (1992). In doing so, the California Supreme Court reversed precedent that held that strict scrutiny was applicable. *Id*. at 917-922.

[109] 430 US 259; 97 S Ct 1047; 51 L Ed 2d 313 (1977).

In *Lockport*, Niagara County, New York, sought to amend its charter in order to provide for a strong form of county government headed by a county executive.  New York law provided that such an amendment could only become effective upon approval by separate majorities of the voters who lived in the cities within the county and of the voters who lived outside the cities.  The amendment to the charter failed both times that it was put to a vote.  Although a majority of the city voters and a majority of the overall votes cast were in favor of the amendment, a separate majority of non-city voters in favor of the amendment was never achieved in either election.  Residents of the cities filed suit, claiming that the concurrent-majority voting scheme unconstitutionally diluted their voting strength because it gave a small number of rural voters disproportionate voting strength.

The Supreme Court *unanimously* rejected the equal protection challenge.[110]  In upholding the New York voting scheme, the Court focused on two points.  First, it found that the *Reynolds* line of cases dealing with one person, one vote in the context of legislative *representation* were

---

[110]    Chief Justice Burger concurred in the judgment, but did not write a separate opinion.

54

of "limited relevance" in analyzing the "single-shot" type of referendum facing the voters in Niagara County because the "expression of voter will is direct" in a referendum.[111] Second, the Court found significant the fact that the voters within the cities and those outside the cities would be affected differently if the county were to adopt a county executive model of government.[112] The Court directly compared the situation at hand to one involving an annexation of land by municipalities and the distinct interests that would exist in such a context.[113] Applying rational basis review, the Court went on to hold that the statute's concurrent-majority voting provision merely recognized "substantially differing electoral interests" and that it did not amount to a violation of the Equal Protection Clause.[114]

*Lockport* is particularly instructive in resolving defendants' equal protection claims. Similar to the

---

[111] *Lockport, supra* at 266.

[112] *Id.* at 269-272.

[113] *Id.* at 271. See Briffault, *Voting rights, home rule, and metropolitan governance: The secession of Staten Island as a case study in the dilemmas of local self-determination*, 92 Colum L R 775, 797-798 (1992).

[114] *Lockport, supra* at 272-273.

Niagara County referendum in *Lockport*, the detachment elections in the present cases are also "single-shot" referenda, thus marginalizing much of the rationale surrounding the *Reynolds* line of cases pertaining to legislative *representation*. The expressed will of the voters in the detachment elections will be direct and unfiltered.

Like the Supreme Court in *Lockport*, I also find significant the existence of disparate electoral interests between city and township residents. In the present cases, it is undisputed that the voters in the townships and those in the cities have "substantially differing electoral interests." If the detachments are approved, one municipality will lose land and others will gain land, thereby implicating divergent interests in the city and the townships on a wide range of issues, including police and fire protection, school districts, taxes, sewer systems, road construction, commercial development, garbage collection, etc.[115] Indeed, the majority itself recognizes this fact by noting the "potential for dramatically

---

[115] See, e.g., *Lockport, supra* at 269-271.

different consequences" among municipalities if the detachments are permitted.[116]

Given these differing electoral interests, I believe it is rational for the Legislature to permit the use of a single detachment petition to transfer land to multiple townships and that such a procedure does not violate the Equal Protection Clause. As the parties noted in their briefs and at oral argument, boundary disputes between townships and cities are nothing new. Indeed, such gamesmanship is not only commonplace, but to be expected given the inherently valuable nature of land in our society. For example, cities often craft annexation proposals with surgical precision so that the territory to be acquired from a township contains one hundred or fewer inhabitants and is thus exempt from a public referendum.[117]

---

[116] *Ante* at 10.

[117] Amicus brief of the Michigan Townships Association at 2-3. As discussed in n 6 of this opinion, an annexation of territory that contains one hundred or fewer residents is subject only to approval by the SBC. MCL 117.9(4).

Justice Levin recognized the gamesmanship that occurs between cities and townships in *Midland Twp*, *supra* at 679, stating that "[c]ity and township strategies based on [the one hundred-resident referendum threshold] are unavoidable. In general, the city will seek to limit the area proposed for annexation so that there are insufficient residents for a referendum and the township will seek to extend the area to require a referendum. The motive or purpose of the city

(continued…)

By repeating this process numerous times, a city may be able to acquire large amounts of land without ever seeking approval from voters.

In light of such tactical territorial disputes between cities and townships, it is not irrational for the Legislature to permit several townships to amplify their voting strength by combining several different parcels into a single detachment petition. In fact, with the significant population disparities that exist between large cities and small townships, such a bundled petition may be the only way that certain detachments could ever be effectuated. By permitting several townships to combine efforts in a single petition, the Legislature has simply recognized that differing electoral interests exist and that, occasionally, similar entities will need to combine forces in order to have any meaningful opportunity at advancing their interests and achieving the various boundary changes authorized under the HRCA.[118] I believe

(…continued)
or township in drawing the proposed boundaries or in requesting a revision of boundaries is not material."

[118] In addition to minimizing the effects of population disparities between cities and townships, there are numerous other reasons why the Legislature may have permitted the use of a single petition to transfer land to multiple townships. For example, it is possible that the
(continued…)

that such a view by the Legislature is entirely reasonable.[119]

Lockport and Hunter demonstrate that the one-person, one-vote standard does not apply in cases involving municipal boundary changes as it does, for example, in the context of legislative representation.[120] Instead, states

---

(…continued)
Legislature recognized the substantial financial expense that townships and cities face when holding elections and that, by combining numerous detachments in one election, it would be less expensive for the taxpayers to have a single election than to have several separate detachment elections.

[119] I find the cases on which defendants rely unpersuasive. In *Hayward v Clay*, 573 F2d 187 (CA 4, 1978), the Fourth Circuit Court of Appeals applied strict scrutiny to an annexation proceeding that required separate majority approval by freeholders. *Hayward* is easily distinguishable from the present cases. *Hayward* involved a grant of disproportionate voting strength to *freeholders*. No such land-based distinction in voting strength exists in the present cases. Instead, the franchise is extended to *all* registered voters in the affected municipalities, regardless of land ownership status. Defendants also cite *Carlyn v City of Akron*, 726 F2d 287 (CA 6, 1984), in which the Sixth Circuit Court of Appeals *refused* to apply strict scrutiny to an annexation proceeding. While I appreciate the dicta that defendants cite from *Carlyn* regarding when strict scrutiny is to apply, I would choose instead to base our resolution of this federal law question on clear precedent from the United States Supreme Court.

[120] Indeed, *Lockport* and *Hunter*, taken together, illustrate that any claim of vote dilution in the municipal boundary change context will be difficult to sustain, absent dilution based on some suspect category such as race. The Supreme Court explicitly rejected "dilution by *aggregation*" in *Hunter* and "dilution by *disproportionate*
(continued…)

maintain broad discretion over municipal boundary changes—discretion that is subject to rational basis review.[121]  The fact that the state has chosen to exercise this power partially through mechanisms provided under the HRCA, which includes public referenda on privately initiated boundary changes, in no way diminishes the state's plenary control over municipal boundaries.  Therefore, considering the differing electoral interests that undoubtedly exist

---

(…continued)
*weight"* in *Lockport*.  With both types of dilution having been flatly rejected by the Supreme Court, it seems quite clear that such cases are not viewed as traditional vote dilution matters, but as matters involving a state's absolute authority over municipal boundaries.

[121] As Professor Briffault has written in discussing the effect of *Lockport*:

> To apply strict scrutiny to the distribution of the vote concerning boundary changes would inevitably entail a constitutional review of the states' municipal formation and boundary change policies. But there are no generally accepted principles for determining whether a particular local government ought to exist, what that unit's geographic dimensions ought to be, or whether a particular territory ought to be in that or another local unit. Thus, deference to the states is consistent with both the lack of a constitutional vantage point for examining state municipal formation and boundary change policies and the traditional jurisprudence of federalism that treats local governments as state instrumentalities and leaves the creation and structure of local governments to the states. [Briffault, *supra*, 60 U Chi L R at 395-396.]

between municipalities in a detachment proceeding and the gross disparities in population that arise, I believe that the Legislature acted rationally in permitting, under the HRCA, the use of a single detachment petition when transferring land to more than one municipality.

While the wisdom of such a policy choice by the Legislature might be debated, this Court is not the proper forum for such an undertaking. Our role is limited to determining whether the HRCA conforms to the Constitution. For the foregoing reasons, I believe that it does.

### B. MANDAMUS RELIEF

#### 1. NATURE OF THE REMEDY

A writ of mandamus is an extraordinary remedy used to enforce duties mandated by law.[122] It is entirely discretionary in nature.[123] Before seeking mandamus relief,

---

[122] *State Bd of Ed v Houghton Lake Community Schools*, 430 Mich 658, 666; 425 NW2d 80 (1988); *Teasel v Dep't of Mental Health*, 419 Mich 390, 409; 355 NW2d 75 (1984); *Howard Pore, Inc v Revenue Comm'r*, 322 Mich 49, 75; 33 NW2d 657 (1948); *Sumeracki v Stack*, 269 Mich 169, 171; 256 NW 843 (1934); *Gowan v Smith*, 157 Mich 443, 470; 122 NW 286 (1909).

[123] *Donovan v Guy*, 344 Mich 187, 192; 73 NW2d 471 (1955); *Fellinger v Wayne Circuit Judge*, 313 Mich 289, 291-292; 21 NW2d 133 (1946); *Geib v Kent Circuit Judge*, 311 Mich 631, 636; 19 NW2d 124 (1945); *Toan v McGinn*, 271 Mich 28, 33; 260 NW 108 (1935); *Sumeracki, supra* at 171; *Industrial Bank of Wyandotte v Reichert*, 251 Mich 396, 401; 232 NW 235 (1930); *Miller v Detroit*, 250 Mich 633, 636; 230

(continued…)

**61**

a plaintiff must complete all conditions precedent to the act that the plaintiff seeks to compel,[124] including a demand of performance made on the official charged with performing the act.[125]  Once this threshold is met, the plaintiff, bearing the burden of proof,[126] must demonstrate: (1) a clear legal right to the act sought to be compelled; (2) a clear legal duty by the defendant to perform the act; (3) that the act is ministerial, leaving nothing to the judgment or discretion of the defendant; and (4) that no other adequate remedy exists.[127]

---

(…continued)
NW 936 (1930); *Taylor v Isabella Circuit Judge*, 209 Mich 97, 99; 176 NW 550 (1920); *Stinton v Kent Circuit Judge*, 37 Mich 286, 287 (1877).

[124] *Cook v Jackson*, 264 Mich 186, 188; 249 NW 619 (1933); *Hickey v Oakland Co Bd of Supervisors*, 62 Mich 94, 99-101; 28 NW 771 (1886).

[125] *Stack v Picard*, 266 Mich 673, 673-674; 254 NW 245 (1934); *Owen v Detroit*, 259 Mich 176, 177; 242 NW 878 (1932) ("[T]he discretionary writ of mandamus will not issue to compel action by public officers without prior demand for such action."); *People ex rel Butler v Saginaw Co Bd of Supervisors*, 26 Mich 22, 26 (1872).

[126] *Baraga Co, supra* at 268; *In re MCI, supra* at 442-443.

[127] *Baraga Co, supra* at 268; *In re MCI, supra* at 442-443; *Houghton Lake Community Schools, supra* at 666; *Pillon v Attorney General*, 345 Mich 536, 539; 77 NW2d 257 (1956); *Janigian v Dearborn*, 336 Mich 261, 264; 57 NW2d 876 (1953); *Howard Pore, Inc, supra* at 75; *McLeod v State Bd of Canvassers*, 304 Mich 120, 125; 7 NW2d 240 (1942); *Rupert v*
(continued…)

**62**

## 2. PLAINTIFFS ARE NOT ENTITLED TO MANDAMUS RELIEF

While I agree with the majority that plaintiffs are not entitled to mandamus relief, I disagree with the majority's rationale. The majority concludes that mandamus relief is improper because the HRCA does not permit the use of a single detachment petition involving multiple townships and, therefore, plaintiffs have no "clear legal right" to the relief they seek.[128] For the reasons stated, I disagree with that conclusion. However, I believe that plaintiffs are not entitled to writs of mandamus because a request for such relief is premature at this time.

As already discussed, before a writ of mandamus will be issued, a plaintiff must complete *all* conditions precedent to the act that the plaintiff seeks to compel.[129] While it is possible that plaintiffs may have already satisfied all requirements imposed by the HRCA, the Secretary of State has yet to make such a determination. The Secretary of State deferred her examination of the

---

(…continued)
*Van Buren Co Clerk*, 290 Mich 180, 183-184; 287 NW 425 (1939); *Toan, supra* at 34; *Sumeracki, supra* at 171; *Gowan, supra* at 470-473.

[128] *Ante* at 13.

[129] See n 124 of this opinion.

petitions until the antecedent question of whether the HRCA permits the use of a single petition involving multiple townships was resolved. The Secretary of State has not yet examined the petitions to determine whether they comply with all the *other* requirements of the HRCA. Therefore, plaintiffs' requests for mandamus relief are premature.

## IV. CONCLUSION

The HRCA is not ambiguous. A plain reading of §§ 9 and 11 demonstrates that the use of a single detachment petition is permitted when seeking to transfer land to multiple townships. Moreover, such a procedure comports with the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs are not entitled to mandamus relief, however, because the Secretary of State has yet to examine the petitions to determine whether all the conditions mandated by the HRCA have been satisfied. Accordingly, in *Casco Twp*, I would reverse the decisions of the Court of Appeals and the trial court and grant declaratory relief. Because the plaintiffs in *Fillmore Twp* did not seek declaratory relief, I would affirm the dismissal of their mandamus action.

For the foregoing reasons, I respectfully concur in part and dissent in part.

Robert P. Young, Jr.

**64**