TAYLOR, J.
In this case, we are called on to determine if defendant Wolverine Pipe Line Company (Wolverine) must obtain the permission of the city of Lansing before constructing a gas pipeline longitudinally in the right-of-way adjacent to an interstate highway when part of the pipeline would be constructed within city limits. We affirm the Court of Appeals decision that Wolverine must obtain local consent but that such consent need not be obtained before the application is submitted to the Michigan Public Service Commission (PSC).
i
Wolverine is an interstate common carrier that constructs, operates, and maintains pipelines used for transporting petroleum products. It planned to construct a twenty-six-mile liquid petroleum pipeline along the Interstate-96 (1-96) corridor, within the right-of-way of the interstate highway. Although the land is under the control and jurisdiction of the state’s Department of Transportation, several miles of the highway are within the city limits.
In December 2001, Wolverine, before commencing any work on the project, filed an application with the PSC for approval of its plan. The mayor and the city, as well as Ingham County Commissioner Lisa Dedden, *157 were allowed to intervene in the PSC proceeding.[1] The application was treated as a contested case and a hearing was held. The city moved to dismiss the application, arguing that the PSC had no jurisdiction because Wolverine’s application lacked the requisite consent from the city. The PSC denied the motion and authorized the project, finding that the city’s consent was not required to accompany the application. With regard to the reasonableness of the project, the PSC determined that there were no equal protection violations in the route selection and found the project necessary and safe.
The city appealed to the Court of Appeals. The Court reviewed the plain language of MCL 247.183 and determined that the statute did require local consent before construction began, but not before the applicant sought PSC approval. 257 Mich App 1,16; 666 NW2d 298 (2003). Both sides sought leave to appeal. Wolverine and the PSC asserted that no local approval is required, and the city argued that approval is required during the application stage. This Court granted leave to appeal on both applications. 469 Mich 904 (2003).
II
We review de novo a question of statutory construction. In construing a statute, we are required to give effect to the Legislature’s intent. That intent is clear if the statutory language is unambiguous, and the statute must then be enforced as written. Weakland v Toledo Engineering Co, 467 Mich 344, 347; 656 NW2d 175 (2003). We use the same rules of construction both for statutes and for administrative regulations. Soap & *158 Detergent Ass’n v Natural Resources Comm, 415 Mich 728, 756-757; 330 NW2d 346 (1982).
hi
The statute that controls this case is MCL 247.183, which reads:
(1) Telegraph, telephone, power, and other public utility companies, cable television companies, and municipalities may enter upon, construct, and maintain telegraph, telephone, or power lines, pipe lines, wires, cables, poles, conduits, sewers or similar structures upon, over, across, or under any public road, bridge, street, or public place, including, subject to subsection (2), longitudinally within limited access highway rights of way, and across or under any of the waters in this state, with all necessary erections and fixtures for that purpose. A telegraph, telephone, power, and other public utility company, cable television company, and municipality, before any of this work is commenced, shall first obtain the consent of the governing body of the city, village, or township through or along which these lines and poles are to be constructed and maintained.
(2) A utility as defined in 23 C.F.R. 645.105(m) may enter upon, construct, and maintain utility lines and structures longitudinally within limited access highway rights of way in accordance with standards approved by the state transportation commission that conform to governing federal laws and regulations. The standards shall require that the lines and structures be underground and be placed in a manner that will not increase highway maintenance costs for the state transportation department. The standards may provide for the imposition of a reasonable charge for longitudinal use of limited access highway rights of way. The imposition of a reasonable charge is a governmental function, offsetting a portion of the capital and maintenance expense of the limited access highway, and is not a proprietary function. The charge shall be calculated to reflect a 1-time installation permit fee that shall not exceed *159 $1,000.00 per mile of longitudinal use of limited access highway rights of way with a minimum fee of $5,000.00 per permit. All revenue received under this subsection shall be used for capital and maintenance expenses incurred for limited access highways.
Wolverine does not here dispute that it is both a “public utility,” as that phrase is used in subsection 1 of the statute, as well as a subsection 2 “utility as defined in 23 C.F.R 645.105[.]”[2] Definitionally, both subsections are applicable to Wolverine unless something in the statute excludes Wolverine from the reach of one subsection or the other. Wolverine argues that such exclusionary language is found in subsection 1, which, paraphrased, states that any covered utility, including those subject to subsection 2, may use a public road longitudinally within the limited access highway right-of-way if it has local permission before work commences. The company’s construction of this passage is that the quoted phrase serves to remove subsection 2 utilities from subsection 1 rules and thus such utilities must only comply with the requirements of subsection 2. In support of this, Wolverine primarily contends that this reading is the only proper construction because otherwise the language “subject to subsection (2)” would be left without meaning. Because such constructions are to be avoided, and because Wolverine believes its reading gives the phrase meaning, it urges us to adopt that *160 reading.[3] We decline to do so, as did the Court of Appeals before us, because we think the reading urged by the city also gives meaning to and more accurately reflects the statute.
We note that Random House Webster’s College Dictionary (2001 ed), defines “subject” when used as an adjective in six ways. The most applicable is the fourth definition, “dependent upon something (usu. fol. by to): His consent is subject to your approval. ” This definition, in essence, gives to the word “subject” the meaning, “dependent upon.” When used as it is here and in other places in the Legislature’s work, it is clear that the subsections work together,[4] see, e.g., MCL 15.443, 18.1237, and 168.677. That is, both subsections are applicable because the relevant words in subsection 1, the “subject to” words, do not mean that the requirements of subsection 1 do not apply to those utilities that are covered also by subsection 2. Further, because the Legislature expressly (and uniquely) used the word *161 “including” before the “subject to” phrase, the implication is even stronger that the two subsections are to be read in combination. Thus, subsection 1 means the project cannot go forward without local approval and, not at all incompatibly, subsection 2 means it cannot go forward unless it meets certain construction standards.
We are aware, and, indeed, Wolverine forcefully argues, that this reading of the statute may facilitate frivolous and potentially crippling resistance from local governments along the route of a utility project. Such an argument, however, misunderstands the role of the courts. Our task, under the Constitution, is the important, but yet limited, duty to read and interpret what the Legislature has actually made the law. We have observed many times in the past that our Legislature is free to make policy choices that, especially in controversial matters, some observers will inevitably think unwise. This dispute over the wisdom of a law, however, cannot give warrant to a court to overrule the people’s Legislature. See Oakland Co Rd Comm’rs v Michigan Prop & Cas Guaranty Ass’n, 456 Mich 590, 612-613; 575 NW2d 751 (1998). We therefore affirm the Court of Appeals decision that subsection 1 as well as subsection 2 control and Wolverine is required by MCL 247.183 to get local consent before constructing its pipeline longitudinally in the right-of-way of 1-96.
rv
Because we find that Wolverine is required to obtain local consent for its project, we must also address the question of when that consent must be obtained. The Court of Appeals found that local consent only has to be secured before work is commenced. Thus, at the time *162 the permit from the PSC was sought, proof of local consent did not need to accompany the application. We agree with this holding.
We begin our analysis with the statute that unambiguously requires local consent “before any of this work is commenced....” MCL 247.183. We note also that the PSC’s applicable rule, 1999 AC, R 460.17601(2) (d), indicates that applications for new construction of utility facilities “shall set forth, or by attached exhibits show, ... [t]he municipality from which the appropriate franchise or consent has been obtained, if required, together with a true copy of the franchise or consent.”[5]
The PSC rule only requires utilities to provide proof of local consent if such is required to be obtained at the *163 time the application is made, and the statute here does not require it. Thus, we agree with the PSC and the Court of Appeals that proof of local consent need not be filed with the application for this project. Although local consent was not filed with the application, the statute and the rules have been complied with and the PSC proceeded well within its authority.
v
Concerning the dissent, we offer the following observations:
(1) The justices in this majority do not necessarily disagree with the dissent that MCL 247.183, as we construe it here, may be “cumbersome.” Post at 185. Nor, by this opinion, does any justice in this majority *164 suggest that, had they been in the Legislature, they would have cast a vote in support of MCL 247.183 as it is interpreted here. Nor are the justices in this majority oblivious to the practical difficulties that our interpretation of the law may impose upon utilities such as Wolverine Pipe Line Company. Rather, what we decide today is merely that the language of MCL 247.183 compels a particular result, and the justices of this majority do not believe themselves empowered to reach a different result by substituting their own policy preferences for those of the Legislature.
(2) Rather than interpreting the language of MCL 247.183, the dissent prefers to divine what it characterizes as the Legislature’s “true intent.” Post at 173. This “true intent” is not one to be gleaned from the words actually enacted into law by the Legislature, but through reliance on various random facts and circumstances that the dissent selectively picks out from the universe of potentially available facts and circumstances. In contrast, rather than engaging in legislative mind-reading to discern the “true intent” of the law, we believe that the best measure of the Legislature’s intent is simply the words that it has chosen to enact into law. Among other salutary consequences, this approach to reading the law allows a court to assess not merely the intentions of one or two highlighted members of the Legislature, but the intentions of the entire Legislature.
(3) The dissent avoids the difficult task of having to read the actual language of the law and determine its best interpretation by peremptorily concluding that MCL 247.183 is “ambiguous.” Post at 174. A finding of ambiguity, of course, enables an appellate judge to bypass traditional approaches to interpretation and either substitute presumptive “ ‘rule[s] of policy,’ ” see Klapp v United Ins, 468 Mich 459, 474; 663 NW2d 447 *165 (2003), quoting 5 Corbin, Contracts (rev ed, 1998), § 24.27, p 306, or else to engage in a largely subjective and perambulatory reading of “legislative history.” However, as Klapp, relying on the treatises of both Corbin and Williston, concluded, a finding of ambiguity is to be reached only after “all other conventional means of [ ] interpretation” have been applied and found wanting.[6] Klapp, supra at 474. Where the majority applies these conventional rules and concludes that the language of MCL 247.183 can be reasonably understood, the dissent, without demonstrating the flaws of the majority’s analysis except to assert that its opinion is not in accord with the “true intent” of the Legislature, opines that an “ambiguity” exists. An analysis, such as that of the dissent, that is in conflict with the actual language of the law and predicated on some supposed “true intent” is necessarily a result-oriented analysis. In other words, it is not a legal analysis at all.
(4) In peremptorily reaching its conclusion that MCL 247.183 is “ambiguous,” the dissent entirely misstates the standard for discerning ambiguity. The dissent would hasten findings of “ambiguity” by courts by predicating these findings on the basis of whether “reasonable minds can differ regarding” the meaning of a statute. Post at 174. Especially in the context of the types of cases and controversies considered by this Court—those in which the parties have been the most determined and persistent, the most persuaded by the merits of their own respective arguments—it is extraordinarily difficult to conclude that reasonable minds cannot differ on the correct outcome. That is not, and *166 has never been, the standard either for resolving cases or for ascertaining the existence of an ambiguity in the law. The law is not ambiguous whenever a dissenting (and presumably reasonable) justice would interpret such law in a manner contrary to a majority. Where a majority finds the law to mean one thing and a dissenter finds it to mean another, neither may have concluded that the law is “ambiguous,” and their disagreement by itself does not transform that which is unambiguous into that which is ambiguous. Rather, a provision of the law is ambiguous only if it “irreconcilably conflict[s]” with another provision, id. at 467, or when it is equally susceptible to more than a single meaning. In lieu of the traditional approach to discerning “ambiguity”—one in which only a few provisions are truly ambiguous and in which a diligent application of the rules of interpretation will normally yield a “better,” albeit perhaps imperfect, interpretation of the law—the dissent would create a judicial regime in which courts would be quick to declare ambiguity and quick therefore to resolve cases and controversies on the basis of something other than the words of the law.[7] Moreover, the dissent implies that the decision of the United States Supreme Court in Yellow Transportation, Inc, v Michigan, 537 US 36; 123 S Ct 371; 154 L Ed 2d 377 (2002), should be read to compel the adoption of his view of how we determine if a statute is ambiguous. We believe this is a misreading of Yellow Transportation. The United States Supreme Court established no rule in Yellow Transportation for determining or resolving *167 statutory ambiguity. Moreover, even if the Court had fixed upon a method it chooses to use to determine if a statute is ambiguous, it could not be understood to have superceded the rules that state courts may use in a like undertaking. The United States courts, of whatever sort, when they rule, are of course always respectfully reviewed by state court judges but such holdings are only binding in a narrow range of cases such as, classically, in the construction and meaning of the United States Constitution. Statutory construction techniques are not of this genre. With that distraction clarified, Yellow Transportation should be understood as a narrow holding that stands for the simple proposition that if a federal administrative agency has given a defensible construction to a federal statute that it applied, then all state courts must follow that construction even if alternative constructions are also reasonable. We deal with no such situation in this case, and thus Yellow Transportation is inapposite in all particulars to this matter.
(5) The dissent wrongly asserts that “the majority fails to construe subsection 1 in light of subsection 2 Post at 177. Rather, we assert that “subsection 1 means the project cannot go forward without local approval and, not at all incompatibly, subsection 2 means it cannot go forward unless it meets certain construction standards,” p 161, and further assert that the “including, subject to subsection (2)” language in subsection 1 makes “the implication ... even stronger that the two subsections are to be read in combination.” P 161. It is the dissent that misapprehends the relationship between subsections 1 and 2 by attempting to read these provisions in isolation and concluding that when read in this manner they compel different results and thus are “ambiguous.” However, the subsections of MCL 247.183, as with all other provisions of law, are not *168 to be read discretely, but as part of a whole. The dissent errs in first reading these subsections “alone” and then asserting that it is reading these subsections “together” when it merely combines its “alone” interpretations. Post at 177. Rather, to read the law as a whole, it must, in fact, be read as a whole. The interpretative process does not, as the dissent does, remove words and provisions from their context, infuse these words and provisions with meanings that are independent of such context, and then reimport these context-free meanings back into the law. The law is not properly read as a whole when its words and provisions are isolated and given meanings that are independent of the rest of its provisions. This is especially true when, as here, one of these provisions expressly cross-references the other.
(6) Therefore, even if the existence of a reasonable disagreement were the standard for identifying ambiguity—which it is not—the dissent’s interpretation of MCL 247.183 is simply not a reasonable one when subsections 1 and 2 are read together, as opposed to being read discretely. It cannot correctly be said that these subsections “apply to different entities,” post at 178, when subsection 1 expressly observes that its provisions are made “subject to subsection (2).” Contrary to the mandate of this Court, the dissent fails to “give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage,” State Farm & Cas Co v Old Republic Ins Co, 466 Mich 142, 146; 644 NW2d 715 (2002), by essentially ignoring the term “including subject to subsection (2)” in its interpretation.
(7) The dissent further asserts that MCL 267.183 is ambiguous because “application of the statute to the facts has rendered the correct application of the statute uncertain.” Post at 176. It is hard to know what this *169 means. While any interpretation of the law is in some sense “fact specific,” the dissent fails to identify why the interpretation of this statute, any more than any other statute, is rendered ambiguous by the instant facts. This majority’s view of the law is that, whenever a public utility constructs a pipeline or other utility project longitudinally within limited access highway rights-of-way, MCL 247.183 requires that the utility must both obtain the consent of the local governing body (subsection 1) and construct the pipeline in accordance with state and federal standards (subsection 2). Is it the dissent’s view that its interpretation pertains in some instances but not in others? If not, what is the relevance of the dissent’s observation that its interpretation is “fact specific”?
(8) Moreover, even if MCL 247.183 were truly ambiguous, the dissent’s analysis of what it views as the relevant legislative history is altogether unpersuasive. In In re Certified Question (Kenneth Henes v Continental Biomass Ind, Inc), 468 Mich 109, 115 n 5; 659 NW2d 597 (2003), this Court emphasized that not all legislative history is of equal value, which “results in varying degrees of quality and utility of legislative history.” There, we stated that examples of “the highest quality of legislative history that relates to an action of the Legislature from which a court may draw reasonable inferences about the Legislature’s intent with respect to an ambiguous statutory provision” are “actions of the Legislature intended to repudiate the judicial construction of a statute” or “actions of the Legislature in considering various alternatives in language in statutory provisions before settling on the language actually enacted.” Id. It is noteworthy that the dissent fails to rely on legislative history of either type. Instead, the dissent largely relies on the least persuasive form of legislative history—staff analyses—which we have *170 found are of “considerably diminished quality,” and thus “are entitled to little judicial consideration in resolving ambiguous statutory provisions . . . Id.[8]
(9) Even examining this legislative history on the dissent’s own terms, we are perplexed about how it supports the dissent’s position. For example, the dissent cites the fact that “SB 1008 was passed without a single ‘nay’ vote in either the House or Senate....” Post at 183. How does this fact, this bit of legislative history, support the dissent’s understanding of the law, i.e., that the Legislature did not intend that utilities must obtain local consent before constructing utility projects in longitudinal highway rights-of-way? How does this demonstrate anything more than that the Legislature unanimously approved the statute being considered today?[9]
Similarly, we believe that the dissent misapprehends the “changes” in which “the Department of Transportation and the major state utilities concurred” when SB 1008 was passed. Post at 184. The dissent suggests that the “changes” concerned the overall effect the bill *171 would have on utility projects constructed in limited access highway rights-of-way. However, when read in context, it appears that the “changes” concerned only the “minor amendments” made by the House of Representatives to SB 1008 concerning the fee structure for such projects. Id.
In fact, when we look at the most valuable type of legislative history available to us, that is, the actual change in statutory language made by the Legislature in 1994, we find support for our view, rather than the dissent’s. Regardless of the vote count, the change that was enacted turned “except longitudinally within limited access highway rights-of-way” to “including, subject to subsection (2), longitudinally within limited access highway rights-of-way.” We find this legislative action to he a strong indication that the “true intent” of the drafters was to include such projects in both subsections, rather than exclude them from subsection 1.
Finally, while we agree with the dissent that the 1994 amendments were intended to “eliminate the ability of the state to deny access to these locations for construction of utility services,” the dissent relies on this statement to support its proposition that “ [i]f the [1994] amendment were meant to remove the state’s power to deny access to these locations, it certainly could not have meant to grant this power to local entities .. . .” Post at 185. Perhaps, the dissent’s assertion is correct, but it is hardly self-evident. There is nothing that logically impels the conclusion that authority is to be denied the locality if it is to be denied the state. While the dissent, and perhaps some justices in this majority, might question the wisdom of a policy that treats the state and localities differently in terms of the approval required for utility pipeline construction, it is hardly inconceivable that a Legislature com *172 mitted to local control or to the principle of subsidiarity might adopt exactly such a policy.[10]
(10) The dissent states that “[wjhile the statute does not clearly indicate whether the Legislature intended to require federally defined utilities to obtain local consent, it appears that this lack of clarity is the result of a clerical error and the intent was not to reverse the 1989 elimination of local control.” Post at 183 (emphasis added). What precisely is this supposed “clerical error”? What is the dissent’s basis for assuming such a “clerical error” occurred? What is the evidence in support of the existence of such a “clerical error”? Is the dissent justifying its conclusion that MCL 267.183 is “ambiguous” on the basis of a “clerical error”? Or is the dissent, instead, asserting that the legislative history of MCL 267.183 not only can be considered, but that this history can supersede its very language?
(11) In the end, the essence of the dissent’s analysis is its (perhaps understandable) frustrated assertion that “I cannot believe that the Legislature intended to subject federally defined public utilities to local consent requirements.” Post at 185. This constitutes less a legal conclusion than a statement of discontent with the fact that the Legislature either had a different perspective on pipeline approval than the dissent or it failed *173 effectively to communicate what the dissent alone knows to be its “true intent.” In either case, there is no warrant for this Court replacing the words of the Legislature with those of its own.
VI
We conclude that the plain language of MCL 247.183 requires Wolverine to obtain local consent before beginning construction of its project. However, local consent is not required at the time of application to the PSC. We therefore affirm the decision of the Court of Appeals in all respects.
CORRIGAN, C.J., and Young and MARKMAN, JJ., concurred with Taylor, J.

 Because of the similarity of interests, these three parties will be referred to as “the city.”

 This includes
a privately, publicly, or cooperatively owned line, facility or system for producing, transmitting, or distributing communications, cable television, power, electricity, light, heat, gas, oil, crude products, water, steam, waste, storm water not connected with highway drainage, or any other similar commodity, including any fire or police signal system, which directly or indirectly serves the public. The term utility shall also mean the utility company inclusive of any wholly owned or controlled subsidiary. [23 CFR 645.105.]

 Wolverine also suggests several ways in which the statute could have been worded to clearly indicate an intent to impose both subsections on longitudinal projects. Wolverine posits that because the statute is not worded in one of the ways it suggests, it follows that the Legislature intended to impose only the requirements of subsection 2 on longitudinal projects. This argument is unconvincing because, while the Legislature doubtlessly could have made its intentions clearer in this statute, the fact that it has not done so by adopting any of Wolverine’s suggested approaches does not reheve this Court of giving meaning to what actually was written.

 Moreover, even if one were inclined to utilize one of the other five definitions in the dictionary (“under the domination, control, or influence of something [often fol. by to]”: “being under the dominion, rule, or authority of a sovereign, state, etc. [often fol. by to]”: “open or exposed [usu. fol. by to]: subject to ridicule”: “being under the necessity of undergoing something [usu. fol. by to]: Ml beings are subject to death”: or “hable, prone [usu. fol. by to]: subject to headaches”), these also lead to the same conclusion that “dependent upon” yields: that interaction, rather than disconnection, of the subsections is called for.

 1999 AC, R 460.17601 reads in its entirety:
(1) An entity listed in this subrule shall file an application with the commission for the necessary authority to do the following:
(a) A gas or electric utility within the meaning of the provisions of Act No. 69 of the Public Acts of 1929, as amended, being §460.501 et seq. of the Michigan Compiled Laws, that wants to construct a plant, equipment, property, or facility for furnishing public utility service for which a certificate of public convenience and necessity is required by statute.
(b) A natural gas pipeline company within the meaning of the provisions of Act No. 9 of the Public Acts of 1929, as amended, being §483.101 et seq. of the Michigan Compiled Laws, that wants to construct a plant, equipment, property, or facility for furnishing public utility service for which a certificate of public convenience and necessity is required by statute.
(c) A corporation, association, or person conducting oil pipeline operations within the meaning of the provisions of Act No. 16 of the Public Acts of 1929, being §483.1 et seq. of the Michigan Compiled Laws, that wants to construct facilities to transport crude oil or petroleum or any crude oil or petroleum products as a common carrier for which approval is required by statute.
*163 (2) The application required in subrule (1) of this rule shall set forth, or by attached exhibits show, all of the following information:
(a) The name and address of the applicant.
(b) The city, village, or township affected.
(c) The nature of the utility service to be furnished.
(d) The municipality from which the appropriate franchise or consent has been obtained, if required, together with a true copy of the franchise or consent.
(e) A full description of the proposed new construction or extension, including the maimer in which it will be constructed.
(f) The names of all utilities rendering the same type of service with which the proposed new construction or extension is likely to compete.
(3) A utility that is classified as a respondent pursuant to the provisions of R 460.17101 may participate as a party to the application proceeding without filing a petition to intervene. It may file an answer or other response to the application.

 While Klapp concerned contract interpretation and the instant case statutory interpretation, the rule stated in Klapp, supra at 474—that ambiguity is a finding of last resort—applies with equal force whether the court is interpreting a statutory text or a contractual one.

 The dissent also confusingly conflates unambiguousness and clarity. Post at 176. Instead, a great many unambiguous provisions of the law are far from clear. The interpretative process is often quite difficult, struggling to remove a great deal of textual underbrush. A provision of law that is unambiguous may well be one that merely has a better meaning, as opposed to a clear meaning.

 “The problem with relying on bill analyses is that they do not necessarily represent the views of even a single legislator. Rather, they are prepared by House and Senate staff. Indeed, the analyses themselves note that they do not constitute an official statement of legislative intent.” Frank W Lynch & Co v Flex Technologies, Inc, 463 Mich 578, 588 n 7; 624 NW2d 180 (2001).

 Our confusion over the dissent’s analysis of legislative history is heightened by its assertion that “the 1994 statutory amendment changed Michigan from a state that generally did not allow entities to use limited access highway rights-of-way, at least not without a permit, to a state that generally does allow the use of limited access highway rights-of-way, even though that use is subject to the requirements contained in subsection 2.” Post at 180. This seems to us not only incorrect, but also contrary to the dissent’s own prior analysis, post at 178-179, in which it notes that pre-1994 subsection 2 did allow use of rights-of-way by federally defined utilities.

 Although not directly applicable to this case because 1-96 is a federal highway and, thus, not a highway “of” the city, perhaps the Legislature intended to require local approval because such approval had been a longstanding part of Const 1963, art 7, § 29, which provides in relevant part:
No person, partnership, association or corporation, public or private, operating as a public utility shall have the right to the use of the highways, streets, alleys or other public places of any county, township, city or village for wires, poles, pipes, tracks, conduits or other public utility facilities, without the consent of the duly constituted authority of the county, township, city or village ....