CHRISDIANA v DEPARTMENT OF COMMUNITY HEALTH

Docket Nos. 276347 and 276440. Submitted March 11, 2008, at Lansing.
  Decided April 29, 2008, at 9:05 a.m.

Rennta Chrisdiana, a pregnant Indonesian citizen legally residing in
  the United States with her husband, an alien who is in the United
  States until he completes a Ph.D. program at Michigan State
  University, brought an action in the Ingham Circuit Court against
  the Department of Community Health and the Department of
  Human Services after her applications for benefits under Medic-
  aid, emergency services only (ESO) Medicaid, and Maternity
  Outpatient Medical Services (MOMS) were denied and the denial
  was upheld by a hearing referee. The application for Medicaid was
  denied because she was not considered a "resident" of Michigan,
  and the application for MOMS was denied because she had not
  established Medicaid eligibility. The plaintiff's husband began
  part-time employment a year after arriving in Michigan. The
  court, Beverley Nettles-Nickerson, J., entered an order on Febru-
  ary 2, 2007, that affirmed the administrative decisions and dis-
  missed the claims. On February 20, 2007, the court entered an
  order that denied the plaintiff's motion for amendment to or relief
  from the February 2, 2007, order or for rehearing or reconsidera-
  tion. The plaintiff appealed as of right from the February 20, 2007,
  order with regard to the Department of Human Services only and
  by leave granted from the February 2, 2007, order with regard to
  both of the defendants. The appeals were consolidated.

  The Court of Appeals *held*:

  1. The relevant federal statutes do not mandate general Med-
  icaid coverage for the plaintiff because she and her husband are
  not permanent residents in the United States. See 42 USC
  1396a(a) and 1396b(v). 42 USC 435.1 *et seq.* provide that "non-
  qualified" aliens such as the plaintiff and her husband would only
  be entitled to ESO Medicaid, presuming they met all other
  eligibility criteria.

  2. The defendants' program eligibility manual (PEM) states
  that "residency" must be satisfied for all the services for which the
  plaintiff applied. The PEM defines "resident" as a person who lives
  in Michigan and intends to remain in Michigan permanently or

indefinitely or a person who entered the state for employment purposes and has a job commitment or is seeking employment. The employment-related residency criterion in the PEM reflects a reasoned determination that employment-related residency should depend on more than mere coincidental employment. The defendants' "for employment purposes" residency definition comports with the purposes of MCL 400.32, which defines a state resident, in part, as a person who entered the state with a job commitment or seeking employment in this state, and 42 CFR 435.403(i)(1)(ii), which defines a state resident, in part, as a person who entered with a job commitment or seeking employment (whether or not currently employed).

3. The plaintiff's husband's part-time employment to facilitate his educational mission does not satisfy the residency definition.

4. 42 USC 1320b-7(f) does not prohibit states from inquiring into Medicaid applicants' immigration status for the purpose of determining state residency as long as the applicants are not effectively required to produce documents they do not actually have.

5. The plaintiff is not entitled to coverage under the MOMS program because she is not a resident of Michigan.

Affirmed.

WHITBECK, P.J., concurred with the conclusion of the majority that the "for employment purposes" residency requirement of the defendant state agencies is consistent and compatible with the intent of the pertinent state and federal legislation. However, he would reach this determination in reliance on the plain language of the legislation and would not resort to examining the legislative history, particularly bill analyses.

SOCIAL SERVICES — WORDS AND PHRASES — RESIDENT.

The definition by the Department of Community Health and the Department of Human Services of the term "resident," for purposes of determining a person's eligibility for a variety of medical assistance programs, as a person who lives in Michigan and intends to remain in Michigan permanently or indefinitely or a person who entered the state for employment purposes and has a job commitment or is seeking employment comports with the purposes of MCL 400.32 and 42 CFR 435.403(i)(1)(ii), which define who is a state resident.

Center for Civil Justice (by *Jacqueline Doig* and *Terri L. Stangl*) for the plaintiff.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *William R. Morris*, Assistant Attorney General, for the defendants.

Before: WHITBECK, P.J., and JANSEN and DAVIS, JJ.

DAVIS, J. Plaintiff appeals as of right and by leave granted orders affirming defendants' administrative denials of plaintiff's applications for benefits under certain public health care programs, specifically, Medicaid, emergency services only (ESO) Medicaid, and Maternity Outpatient Medical Services (MOMS).[1] We affirm.

Plaintiff is an Indonesian citizen legally residing in the United States pursuant to a J2 visa, and her husband is in the United States pursuant to a J1 visa. J1 visas are "nonimmigrant visas" given to "exchange visitors," or aliens with no intention of abandoning their foreign residences who are in the United States as students, scholars, teachers, or certain other kinds of visitors. 8 USC 1101(a)(15)(J); 22 CFR 62.1 *et seq.* J2 visas are given to dependents or spouses of persons with J1 visas. Plaintiff and her husband came to the United States in 2002 after he was admitted to a Ph.D. program at Michigan State University. In 2003, plaintiff's husband also began working part-time. Plaintiff and her family can remain in the United States for as long as it takes her husband to complete his degree.

Plaintiff became pregnant in 2005, and she applied to defendants for medical assistance. She applied for both Medicaid and MOMS. Her application for Medicaid was

[1] Although the Department of Community Health is not named a defendant in Docket No. 276440, both of these consolidated appeals arise out of the same lower-court action, and there is some overlap in plaintiff's claims against both, so we will refer to them collectively.

denied because she was not considered a "resident," and her application for MOMS was denied because she had not established Medicaid eligibility. The Medicaid denial was upheld by a hearing referee after a hearing. Plaintiff commenced the instant action in the circuit court, arguing that she satisfied the definition of a state "resident" under controlling federal Medicaid law, minimally entitling her to ESO Medicaid, and arguing that she was also eligible for the MOMS program under other controlling federal law. The trial court disagreed, and these appeals followed.

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). A motion brought under MCR 2.116(C)(8) should be granted only where the complaint is so legally deficient that recovery would be impossible even if all well-pleaded facts were true and construed in the light most favorable to the nonmoving party. *Maiden, supra* at 119. Only the pleadings may be considered when deciding a motion under MCR 2.116(C)(8). *Maiden, supra* at 119-120. However, review of a motion for summary disposition pursuant to MCR 2.116(C)(4) entails consideration of all documentary evidence submitted by the parties. *Beulah Hoagland Appleton Qualified Personal Residence Trust v Emmet Co Rd Comm*, 236 Mich App 546, 550; 600 NW2d 698 (1999).

Although agencies are authorized to interpret the statutes they are charged with administering and enforcing, agencies may not do so by promulgating rules that conflict with the statutes they purport to interpret. *Clonlara, Inc v State Bd of Ed*, 442 Mich 230, 240-241, 243-244; 501 NW2d 88 (1993). Even where the rule at

issue is not promulgated pursuant to formal rulemaking requirements, "an agency policy is still required to be within the matter covered by the enabling statute, comply with the underlying legislative intent, and not be arbitrary or capricious." *Pyke v Dep't of Social Services*, 182 Mich App 619, 632; 453 NW2d 274 (1990). Rules need not be mere reiterations of a statute, but the "rules must be within the matter covered by the enabling statute, they must comply with the underlying legislative intent, and they must not be arbitrary and capricious." *Cevigney v Economy Fire & Cas Co*, 185 Mich App 256, 263; 460 NW2d 294 (1990).

Agency interpretations of statutes should be afforded great weight and deference, especially where the interpretation of a statute involves "reconciling conflicting policies" or "more than ordinary knowledge respecting the matters subjected to agency regulations." *Chevron USA, Inc v Natural Resources Defense Council, Inc*, 467 US 837, 844; 104 S Ct 2778; 81 L Ed 2d 694 (1984). As long as an agency's interpretation of a statute does not "clearly contradict[] the will of the legislature" or violate the statute's plain language, the courts should defer to it. *Smith v Babcock*, 19 F3d 257, 261 (CA 6, 1994). The legal rulings of administrative agencies are entitled to deference if "they are consistent with the purpose and policies of the statute in question." *Adrian School Dist v Michigan Pub School Employees' Retirement Sys*, 458 Mich 326, 332; 582 NW2d 767 (1998). In other words, the question is whether the agency "made a faithful reading of the Legislature's intent when it interpreted the statutory language." *Id.* at 333. A state court or agency is competent to interpret a federal regulation unless preempted by a zone of

exclusive federal jurisdiction. *Adrian Energy Assoc v Michigan Pub Service Comm*, 481 F3d 414, 420 n 6 (CA 6, 2007).

Primarily at issue is whether plaintiff is a "resident" of Michigan. Defendants publish a "Program Eligibility Manual" (PEM) that sets forth a number of "eligibility factors" that applicants must satisfy to obtain a variety of medical assistance services. According to the PEM, "residency" must be satisfied for all of the services for which plaintiff applied, including Medicaid, ESO Medicaid, and MOMS.

We note that 42 USC 1396a(a) mandates that "a State plan shall provide medical assistance with respect to an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law only in accordance with section 1396b(v) of this title." The latter provides that, except for certain emergency services, "no payment may be made to a State under this section for medical assistance furnished to an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law." Plaintiff and her husband are not permanent residents in the United States, so the federal statutes do not mandate general Medicaid coverage for plaintiff. Similarly, the provisions of 42 CFR 435.1 *et seq.* explain that "non-qualified" aliens—which plaintiff and her husband are—would only be entitled to ESO Medicaid, presuming they meet all other eligibility criteria.

Defendants' PEM 220 sets forth the definition of a "resident" of Michigan as, in relevant part, either of two possibilities: (1) a person who lives in Michigan "and intends to remain in Michigan permanently or indefinitely," or (2) a person who "entered the state of Michigan for employment purposes" and has a job

commitment or is seeking employment. Plaintiff contends that the second possible definition[2] conflicts with the Social Welfare Act, MCL 400.1 *et seq.* MCL 400.32 provides:

> (2) For purposes of the family independence program and medical assistance under this act, a resident of this state is a person who is living in this state voluntarily with the intention of making his or her home in this state and not for a temporary purpose and who is not receiving assistance from another state. For purposes of medical assistance, a resident of this state also includes a person and the dependents of a person who, at the time of application, is living in this state, is not receiving assistance from another state, and entered the state with a job commitment or seeking employment in this state. . . .

> (3) For purposes of medical assistance eligibility the requirements in subsection (2) apply except as otherwise provided in federal regulations for the administration of the medical assistance program under title XIX of the social security act, 42 U.S.C. 1396 to 1396g and 1396i to 1396v.

Also, 42 CFR 435.403(i)(1)(ii) provides that for Medicaid purposes, a "state resident" is defined, among other things, as residing in "the State where the individual is . . . [l]iving and which the individual entered with a job commitment or seeking employment (whether or not currently employed)."

---

[2] Plaintiff also asserted below that "intent to remain indefinitely" could be satisfied by having no definite schedule for leaving. We find that the word "indefinite" was intended to mean essentially what was set forth in MCL 400.32(2): "living in this state voluntarily with the intention of making his or her home in this state and *not for a temporary purpose* and who is not receiving assistance from another state." (Emphasis added.) In other words, intent to remain "indefinitely" means that the individual has no definite plans to leave, not that the individual has no definite plans regarding the duration of a definitely temporary stay. The juxtaposition with "permanently" means that the individual does not need to intend never to leave. However, the individual must have no definite plans to do so in any known time span.

Plaintiff contends that the statute and the regulation only require entering a state with a job commitment or seeking employment, so PEM 220 imposes an impermissible additional requirement of entering "for employment purposes." We disagree.

"The rules must be within the matter covered by the enabling statute, must comply with the underlying legislative intent, and must not be arbitrary or capricious." *Faircloth v Family Independence Agency*, 232 Mich App 391, 405 n 7; 591 NW2d 314 (1998). The subject matter of the relevant statutory and regulatory provisions is an employment-related criterion for determining whether an applicant should be considered a "resident" of a state for the purposes of Medicaid eligibility; it is clear that PEM 220 falls within this same subject matter. An agency determination is arbitrary and capricious when it is based on whim or caprice rather than considered and principled reasoning. *Galuszka v State Employees' Retirement Sys*, 265 Mich App 34, 45-46; 693 NW2d 403 (2004). The employment-related residency criterion in PEM 220 clearly reflects a reasoned determination that employment-related residency should depend on more than mere coincidental employment; although plaintiff argues that it is wrong, it nevertheless reflects a rational, systematic, and easily understood rule. Therefore, the only remaining question is whether that requirement violates the underlying legislative intent.

As long as there is no ambiguity, the best indicator of legislative intent is the plain language of a given statute, including all words and phrases, and including context and placement within any larger statutory scheme. *Sun Valley Foods Co v Ward*, 460 Mich 230, 236-237; 596 NW2d 119 (1999). We observe some ambiguity flowing from reading the above provisions as a

whole. MCL 400.32(2) contains numerous references to other states, and 42 CFR 435.1 *et seq.* as a whole makes distinctions between aliens and United States citizens for purposes of eligibility for Medicaid. It is not clear that defendants' requirement of an employment *purpose* is incompatible with the goals intended by the statutes. Upon review of the legislative histories behind these provisions, we conclude that defendants' residency definition *does* comport with the purposes of these provisions.

Before they were rewritten by 1980 PA 122, the predecessor statutes to the modern version of MCL 400.32 were all concerned with when a person who is already receiving "assistance" *ceases* to be considered a "resident" after leaving the state. 1980 PA 122 provided essentially the current version of the relevant language, and the bill analyses indicate that the Legislature's primary concern remained the determination of when a recipient should *no longer* receive assistance. Moreover, the focus of MCL 400.32 was on residency *as between the individual states*, not in an absolute sense. Finally, 1980 PA 122 was additionally intended to remove an obsolete durational residency requirement and to further ensure consistency and conformity with the applicable federal regulations, making interpretation of those federal regulations even more important.

The history of 42 CFR 435.403 is similar. It was originally adopted as 42 CFR 448.40(b), and when the Medicaid rules were reorganized with their current numbering in 1978, it had provided as follows:

> (a) The agency must provide medicaid to otherwise eligible residents of the State.
>
> (b) For purposes of this section —
>
> (1) "Resident" of a State is an individual who is living in the State voluntarily with the intention of making his

home there and is not living in the State for a temporary purpose. A child is a resident of the State in which he is living other than on a temporary basis.

(2) In determining residence, the agency may not consider the reason for which the individual entered the State, except to the extent that the reason may bear upon whether he is residing in the State voluntarily or for a temporary purpose.

(3) An individual retains his residence until he abandons it. Temporary absence from the State, with subsequent returns to the State or intent to return when the purposes of the absence have been accomplished, does not interrupt residence. [43 Fed Reg 45176, 45183, 45210 (September 29, 1978).]

The above rule had resulted in problems, among them was "when highly, [sic] mobile workers move from State to State and are denied Medicaid eligibility by each State to which they apply, on the grounds they are in a State only for a temporary purpose. The prime example is the migrant farm worker. who is denied eligibility all along the migrant stream." 43 Fed Reg 35077 (August 8, 1978).

Therefore, a proposed rule change would have specified "living in the State for purposes of employment" as one of the residency criteria. 43 Fed Reg 35079 (August 8, 1978). However, concern arose that migrant families would be stymied by "the discrepancy between rules for parents, who would be covered by the more liberal definition, 'for purposes of employment,' and those for children, who would be locked into the Aid to Families with Dependent Children (AFDC) definition, 'not for a temporary purpose.'" 44 Fed Reg 41436 (July 17, 1979). Therefore, to ensure consistent application by the states and consistency between regulations, the Social Security Administration changed the wording to the current test. The Social Security Administration

admonished that "States may not construe 'seeking employment' in a restrictive sense by applying rigorous work search requirements on an individual for purposes of satisfying residence." 44 Fed Reg 41436 (July 17, 1979). Nevertheless, it is clear that the federal rule was also concerned with residency *as between the individual states,* and even more critically, the focus of the employment-related criterion was on whether the applicant was present in the state *because of* employment there.

The underlying legislative intent behind MCL 400.32(2) and 42 CFR 435.403(i)(1)(ii) shows that the primary concern was with determining *which of several* states an applicant was a "resident" of. The secondary concern was requiring the applicant to be in the state *for employment reasons,* but without imposing on the applicant a significant burden of demonstrating those employment reasons. We hold that the "for employment purposes" residency requirement of defendant state agencies is consistent and compatible with the intent of the pertinent state and federal legislation.

Plaintiff contends that her husband nevertheless satisfies defendants' residency definition because he came to Michigan for the dual purposes of education *and* employment. We disagree. Even aside from the purposes underlying the exchange-visitor program, it is clear from the record that the only reason why plaintiff's husband sought employment was to facilitate his educational mission. Put another way, the degree program at Michigan State University was his motivation for coming to the United States; obtaining employment was solely to enable him to pursue that goal, not a goal in and of itself. We recognize plaintiff's argument that our Supreme Court has found no impediment to classifying individuals as both students at and employees of a

university for the purpose of the public employment relations act, MCL 423.201 *et seq*. *Regents of Univ of Michigan v Employment Relations Comm*, 389 Mich 96, 109-113; 204 NW2d 218 (1973). However, although there is no theoretical reason why an individual could not have a true dual purpose for coming to Michigan, the record shows that if plaintiff's husband did not have his educational goal as his primary purpose for coming to Michigan, his employment-related purpose would never have existed.

Plaintiff also contends that defendants denied her medical assistance solely on the basis of knowledge they obtained from the immigration documents that defendants required her to provide. Plaintiff contends that defendants were not permitted to demand those documents, so the denial must be reversed. We disagree.

Plaintiff argues that under 42 USC 1320b-7(f), defendants *may not* require noncitizens to submit immigration documentation when applying for ESO Medicaid. 42 USC 1320b-7(f) states that "[s]ubsections (a)(1) and (d) of this section shall not apply with respect to aliens seeking medical assistance for the treatment of an emergency medical condition under section 1396b(v)(2) of this title." 42 USC 1320b-7(a)(1) and (d) explicitly require states to condition medical assistance on verification of applicants' Social Security numbers and legal immigration status. 42 USC 1396b(v)(2) essentially provides that emergency medical treatment may not be denied to illegal aliens on the basis of their legal status in the United States, *provided* they nevertheless meet the state's own residency requirements.

Plaintiff argues that the effect of 42 USC 1320b-7(f) is to *preclude* states from demanding the same documentation. But this reading is not logical. All 42 USC 1320b-7(f) does is remove an affirmative requirement;

it does not impose a prohibition. Therefore, where 42 USC 1320b-7(f) applies, the state *need not* demand immigration documentation from applicants, contrary to plaintiff's assertion that the state *must not* demand the same documentation. The only court in the nation that we have found to have discussed 42 USC 1320b-7(f) reached essentially the same conclusion: that section of the code does not prohibit states from inquiring into Medicaid applicants' immigration status, as long as those applicants are not effectively required to produce documents they do not actually have. *Crespin v Coye*, 27 Cal App 4th 700, 711-712; 34 Cal Rptr 2d 10 (1994).

Plaintiff also relies on two nonbinding policy statements issued by the United States Department of Health and Human Services Office for Civil Rights. The first[3] relies on what appears to be the same inaccurate reading of 42 USC 1320b-7(f) that plaintiff employs, and it additionally contains an important qualifier that the applicant "qualifies for emergency Medicaid coverage." As discussed, plaintiff does *not* qualify for emergency Medicaid coverage because she does not meet Michigan's residency requirement.

Under 42 CFR 435.406(b), emergency Medicaid services must be provided "to residents of the State who . . . are non-qualified aliens who meet all Medicaid eligibility criteria, except non-qualified aliens need not present a social security number or document immigration status." Again, the context reveals that the absence of a need to "present a social security number or

---

[3] The second merely opines that asking ESO Medicaid applicants about their immigration status *might potentially* raise civil-rights issues *if* the *effect* is actually discriminatory in that it deters "otherwise eligible applicants who are protected against discrimination by Title VI from applying for benefits." As we discuss, plaintiff is not otherwise eligible and she was not asked to provide documents she did not possess, so this theoretical specter did not materialize here.

document immigration status" refers to determining whether the applicant "meet[s] all Medicaid eligibility criteria . . . ." A state is not precluded from seeking whatever immigration documentation the applicant has—if any—for the purpose of determining state residency. The only possible preclusion would be if Medicaid applicants were required to produce documentation that they do not have, because, in accord with *Crespin*, the effect of such a requirement would be to preemptively deny ESO Medicaid on the basis of citizenship or immigration status.

That preclusion does not apply here.[4] The entire statutory framework regarding emergency Medicaid for "unqualified" aliens was intended to address aliens who are present in the United States without the consent of the United States government or any department or agency thereof. See *Lewis v Thompson*, 252 F3d 567, 571-572 (CA 2, 2001), explaining that it regarded an "alien who was not a permanent resident or 'otherwise permanently residing in the United States under color of law' " as somewhat vague but minimally including "at least those aliens who are residing in the United States with the INS's [Immigration and Naturalization Service's] knowledge and permission and whom the INS does not contemplate deporting." In other words, 42 USC 1320b-7(f) appears intended to protect ESO Medicaid availability for aliens who simply do not have any documentation to provide. Therefore, plaintiff and

---

[4] Although it does not affect this case, we do believe defendants' MIChild and Healthy Kids application form runs afoul of this preclusion in one respect. The form requires all applicants, even applicants for emergency-only services, to be United States citizens or to provide documentation of their legal status in the United States, irrespective of whether they have any such documentation. It is possible for an undocumented alien to nevertheless be a Michigan "resident," so this might have the effect of preemptively denying emergency services on the basis of immigration status.

her husband are not really in the class of aliens the statute seeks to protect. Nothing in the federal statutes or regulations forbids a state from requiring a Medicaid applicant—even a mere ESO Medicaid applicant—to provide documentation that the applicant has bearing on the applicant's *residency* status. In this case plaintiff's immigration documentation did shed light on plaintiff's intentions concerning residency.

In conclusion, defendants' residency requirements do not conflict with any controlling federal law, nor does the application requirement of presenting any immigration documentation that the applicant might have for the purpose of determining residency. Plaintiff actually had the requested documentation to provide, and she does not satisfy the definition of a Michigan "resident." Therefore, the trial court properly upheld the agency denial of plaintiff's Medicaid and ESO Medicaid applications.

Plaintiff finally contends that she is entitled to coverage under the MOMS program irrespective of her Medicaid or ESO Medicaid eligibility. We disagree.

Plaintiff asserts that the eligibility criteria for the MOMS program are preempted by federal law, because she alleges that the MOMS is part of the federal State Children's Health Insurance Program (SCHIP) block grant under 42 USC 1397aa *et seq*. The purpose of the SCHIP program is "to initiate and expand the provision of *child* health assistance to uninsured, low-income *children* in an effective and efficient manner that is coordinated with other sources of health benefits coverage for *children*." 42 USC 1397aa(a) (emphasis added). According to 42 CFR 457.10, "[c]hild means an individual under the age of 19 including the period from conception to birth." And according to 42 CFR 457.320(d)(2)(i), states may establish eligibility requirements, but those requirements may not exclude "[a] non-institutionalized child who is not a ward of the

State, if the child is physically located in that State, including as a result of the parent's or caretaker's employment in that State." Thus, plaintiff contends that, under federal law, her fetus was a "child" that cannot be excluded from a state's residency definition and is, as a result, entitled to health insurance.

The parties have not provided us with, nor have we been able to discover, any documentation indicating whether the MOMS program is funded by SCHIP, or indeed how it is funded at all. But more directly dispositive is our conclusion that the MOMS program is not actually health care for children at all. According to PEM 657, services are provided for women who are pregnant or who were pregnant "within two calendar months following the month pregnancy ended," including postpartum care for those two months. The MOMS program is described as a program *for women*. Tellingly, services for the infant, once born, are explicitly *not* covered, even while the infant's mother would continue to be. Plaintiff's assertion that the fetus must be considered a "resident" under 42 CFR 457.10 and 457.320(d)(2)(i) is irrelevant given that the recipient of whatever services or payments are provided by the MOMS program is *the pregnant woman herself*, not the child or fetus.[5] Nothing in the above-cited Federal Register sections affects whether *plaintiff* is considered a "resident" of the state, and because *she* is the recipient of the MOMS services, it is only *her* residency that matters. As we have determined, plaintiff is not a "resident" of Michigan, and as a result she is not entitled to coverage under the MOMS program.

---

[5] We further note that 42 USC 1397jj(c)(1) only provides that "[t]he term 'child' means an individual under 19 years of age," suggesting a child who is born, and, under 42 USC 1397bb(b)(4), "[n]othing in this subchapter shall be construed as providing an individual with an entitlement to child health assistance under a State child health plan."

Affirmed.[6]

JANSEN, J., concurred.

WHITBECK, P.J. (*concurring*). While I agree with the majority's conclusion that the "for employment purposes" residency requirement of defendant state agencies is consistent and compatible with the intent of the pertinent state and federal legislation, I would reach this determination by relying on the plain language of the legislation alone rather than resorting to examination of the legislative history, particularly bill analyses.

> "The problem with relying on bill analyses is that they do not necessarily represent the views of even a single legislator. Rather, they are prepared by House and Senate staff. Indeed, the analyses themselves note that they do not constitute an official statement of legislative intent."[1]

Therefore, bill analyses "are of 'considerably diminished quality,' and thus 'are entitled to little judicial consideration in resolving ambiguous statutory provisions . . . .' "[2]

---

[6] Defendants also point out that plaintiff's J2 visa required her to obtain private health insurance, which she allegedly did not do. This is not directly relevant, because, as discussed, immigration status is not a requirement for the services at issue here. However, this visa requirement suggests an understanding by Congress that temporary visitors under J-class visas are not entitled to publicly funded medical services. That, in turn, suggests that Congress did not intend to require states to provide Medicaid or ESO Medicaid as broadly as plaintiff argues. We note this only as an aside, not to address whether plaintiff is *actually* in compliance with her visa requirements or what consequences, if any, would follow if she is not.

[1] *Lansing Mayor v Pub Service Comm*, 470 Mich 154, 170 n 8; 680 NW2d 840 (2004), quoting *Frank W Lynch & Co v Flex Technologies, Inc*, 463 Mich 578, 588 n 7; 624 NW2d 180 (2001).

[2] *Id.* at 169-170, quoting *In re Certified Question (Kenneth Henes v Continental Biomass Industries, Inc)*, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003).

I agree with the remainder of the majority's conclusions regarding the issues presented.